RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0025a.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————————

JUNIOR BLACKSTON,

                          *Petitioner-Appellee*,

    *v.*

                       No. 12-2668

LLOYD RAPELJE,

                          *Respondent-Appellant*.

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit
No. 2:09-cv-14766—Arthur J. Tarnow, District Judge.

Argued: November 20, 2013

Decided and Filed: February 17, 2015

Before: DAUGHTREY, KETHLEDGE, and DONALD, Circuit Judges.

—————————————

## COUNSEL

**ARGUED:** B. Eric Restuccia, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Kimberly A. Jolson, JONES DAY, Columbus, Ohio, for Appellee. **ON BRIEF:** B. Eric Restuccia, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Kimberly A. Jolson, JONES DAY, Columbus, Ohio, for Appellee.

     DAUGHTREY, J., delivered the opinion of the court in which DONALD, J., joined. KETHLEDGE, J. (pp. 28–30), delivered a separate dissenting opinion.

1

---------------------------

**AMENDED OPINION**

---------------------------

MARTHA CRAIG DAUGHTREY, Circuit Judge.  Petitioner Junior Fred Blackston is a Michigan state prisoner serving a life sentence for murder following his retrial and conviction in state court.  Before the second trial was held, two of the state's key witnesses recanted their testimony.  Because those witnesses were later determined to be unavailable at the new trial, the court ordered their earlier testimony read to the jury, while at the same time denying Blackston the right to impeach their testimony with evidence of their subsequent recantations.  After exhausting his state remedies unsuccessfully, Blackston sought federal habeas relief, contending that the state unreasonably abridged his clearly established federal constitutional right to confrontation.  The district court granted a conditional writ.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

This case arises from the murder of Charles Miller, a 22-year-old Michigan resident who disappeared late in the night of September 12, 1988.  His fate remained a mystery until 1999, when a cold-case investigation team began re-interviewing Miller's former friends and associates.  One of these associates, Charles Dean Lamp, admitted involvement in the disappearance and eventually led police to the location of Miller's skeletal remains, buried in the woods near Lamp's property.  Lamp explained that he and the petitioner in this case, Junior Fred Blackston, had decided to kill Miller together and carried out the killing with the assistance of a third man, Guy Carl Simpson.

The state charged Blackston with first-degree murder.  In exchange for his testimony, the state granted Simpson immunity from prosecution and permitted Lamp to plead guilty to a lesser-included charge of manslaughter.  No physical evidence connected Blackston to Miller's death, so the state's case depended entirely on the testimonial evidence of five witnesses: the accomplices Lamp and Simpson; Darlene Rhodes Zantello (Blackston's ex-girlfriend); Rebecca Krause Mock (the victim's girlfriend); and Roxann Krause Barr (Mock's sister).

The details of the killing itself come almost entirely from the testimony of Lamp and Simpson at Blackston's initial trial. According to them, Blackston was angry at Miller because he believed Miller was planning to rob Blackston's cocaine wholesaler, a man named Bennie Williams. Lamp suggested that they kill Miller, using one of Lamp's rifles, and bury him near Lamp's property. Blackston agreed. To lure Miller to the ambush site, Blackston invited Miller to join them for a night-time raid on a clandestine marijuana field known to be in the area. Simpson arrived unexpectedly at Blackston's house that evening, and ended up joining the proposed raid.

Lamp and Simpson further testified that Lamp drove all four men (plus Blackston's one-year-old daughter) to a wooded area near Lamp's property. Once there, Lamp handed Blackston a hunting rifle and walked ahead to find the pre-dug hole in which they planned to bury Miller after killing him. Simpson hung back with Miller and Blackston. Once Lamp reached the hole, he yelled, "I found it." Simpson then saw Blackston raise the rifle and shoot Miller in the back of the head or neck. After the shooting, Simpson and Blackston dragged Miller's body to the hole and threw it in; Blackston then climbed into the hole and cut off Miller's ear. Lamp filled in the hole with dirt and concealed it with underbrush. The three men drove back to Blackston's house at about 12:30 a.m. on September 13.

The defense impeached Simpson and Lamp's credibility on several grounds, including charges that they had fabricated their testimony in exchange for favorable deals with the government. The defense also identified inconsistencies among Simpson's earlier stories relating to Miller's disappearance—Simpson had, at various times, identified other individuals as the killer (including Lamp), and had also claimed that Miller was still alive. The state attempted to rehabilitate Simpson's credibility with evidence of prior statements consistent with his trial testimony, including written statements to his brother and to Zantello.

Darlene Rhodes Zantello, Blackston's long-time girlfriend, also testified against Blackston at his first trial. At the time of Miller's disappearance in 1988, Blackston and Zantello lived together. They had one child and Zantello was pregnant with a second. Zantello testified that on the night of Miller's disappearance, she experienced abdominal pains and made an emergency trip to the hospital with Blackston's sister Sheila. When she left her home for the

hospital, Blackston, Miller, and Simpson were together at the house. When she returned from the hospital around midnight, she said, no one was home.

Zantello testified that after Blackston and Simpson returned to the house later that night, she overheard them discussing gory aspects of a killing of some kind. The discussion (which Zantello remembered only vaguely) included references to a severed ear, vast amounts of blood, and Blackston "almost bl[owing] [somebody's] whole head off." The defense impeached Zantello with her admittedly bad memory, bad hearing, and history of alcoholism and drug use. She was also questioned about prior inconsistent statements she had made, some of which exculpated Blackston.

Rebecca Mock and Roxann Barr were members of the same social circle as both Blackston and Miller. They testified that Blackston made certain incriminating statements to them in the weeks following Miller's disappearance. According to Mock, who was Miller's former girlfriend, Blackston twice admitted involvement in Miller's death. First, at a party in a public park, Blackston admitted to shooting Miller and cutting off his ear. Later, at a second party at Zantello's house, Blackston again hinted at his involvement but offered no details.

Barr, who is Mock's younger sister, testified that she was present at each of the two parties at which Mock supposedly heard Blackston confess to the murder. Barr testified, however, that Blackston "never said that he shot [Miller] himself." Instead, she recalled that Blackston identified Lamp as the shooter at the first party and made no incriminating statements at the second party. The defense impeached both sisters with evidence of their intoxication at the time of the purported admissions, as well as with their admitted history of alcohol, marijuana, cocaine, and crack use. Barr conceded that she had used drugs the night before testifying at trial.

Blackston's defense at trial was to deny participation in the murder and instead offer an alibi. He called his three sisters—Sheila, Shirley, and Linda—as witnesses, each of whom testified that Blackston was at home throughout the entire night of September 12-13. Sheila testified that she drove Zantello to the hospital that night and that Blackston was home alone with the child when she and Zantello returned. Shirley testified that she visited Blackston's home shortly after midnight and found him in the house with the child and their sister Linda. Linda testified that she got into a fight with her husband at 11:30 p.m. on September 12 and went

to her brother's house to cool down. She said that her brother was there until she left at 12:45 a.m. Blackston also called Williams (the former cocaine wholesaler), who denied ever knowing Miller and also denied that anyone ever brought him a human ear.

The jury convicted Blackston of Miller's murder. However, the trial judge reversed Blackston's conviction after determining that he had misinformed the jury regarding the extent of Simpson's immunity deal. The state announced its intention to retry Blackston.

Before the second trial began, Zantello and Simpson prepared written statements in which they recanted their testimony from the first trial. Zantello's statement was signed and notarized. In it, she wrote that her earliest statements to police, in which she exculpated Blackston, were correct and that her contrary trial testimony was untrue. Blackston was at home with their daughter when she returned from the hospital, she wrote, and she never overheard any conversation about a killing or a severed ear. Zantello wrote in her affidavit that she testified falsely because the state promised to drop an array of criminal charges pending against her and against her then-boyfriend.

Simpson's recantation was signed but not notarized. Like Zantello, he stated that his trial testimony was false and that Blackston was not involved in Miller's death. He claimed that Blackston remained at home during the marijuana raid, that Lamp, not Blackston, killed Miller, and that a shovel, not a rifle, was the murder weapon. Simpson claimed that he perjured himself because of prosecutorial pressure and because Lamp (who had a reputation for violence and whom Simpson feared) had made threats against Simpson and his family.

At the second trial, the state called Simpson as the first witness for the prosecution, but Simpson's testimony swiftly went awry. Although physically present in the courtroom, Simpson behaved erratically, refused to answer substantive questions, and conditioned his willingness to testify on the satisfaction of various bizarre requests (for example, he wanted the judge to recess court so that he could take a shower). The trial judge soon tired of this behavior and had Simpson removed from the courtroom. Pursuant to Michigan Rule of Evidence 804, the judge then deemed Simpson to be an "unavailable" witness and, over defense objections, ordered Simpson's testimony from the first trial read to the jury. The judge overruled the defense's

request that Simpson's recantation also be read to the jury, reasoning that the recantation was not admissible as a *prior* inconsistent statement.

Zantello's testimony followed a similar track. Called by the prosecution, Zantello took the stand but was essentially unresponsive to questioning—she answered each question either by claiming memory loss or asserting her privilege against self-incrimination. As with Simpson, the trial judge deemed Zantello "unavailable" and ordered her testimony from the first trial read to the jury. The defense sought to have Zantello's recantation read to the jury as well, but the judge again denied the motion, citing the same basis. After the recitation of her earlier testimony, Zantello took the stand and was briefly questioned again, to similarly little effect. Before Zantello left the stand, defense counsel was able to interpose a single question averring to the existence of the recanting affidavit. Zantello, however, refused to answer, and the judge immediately cut off further questioning. The testimony of all remaining witnesses was consistent with their testimony during the first trial. The second jury convicted Blackston of first-degree murder.

Blackston moved for a new trial, arguing that the recantations should have been admitted under Michigan Rule of Evidence 806.[1] At a hearing on the motion, the trial judge conceded that he "didn't really think about [Rule] 806 when I kept these statements out, but now that I've thought about 806, I would agree that it would appear to say that they should come in." Nevertheless, he refused to order a new trial, ruling that the recantations were unfairly prejudicial to the prosecution and, therefore, would have been excluded under Rule 403 in any event.[2] More than simple inconsistent statements, the judge deemed the recantations "epistles, in some senses . . . and an advocacy for acquittal. It goes far beyond a mere statement." The court also

---

[1]Michigan Rule of Evidence 806 provides:

(A) When a hearsay statement . . . has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness.

(B) Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain.

[2]Michigan Rule of Evidence 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . .

found that both witnesses, particularly Simpson, were "manipulating" the trial process and that their recantations were simply attempts to get Blackston acquitted while still taking advantage of the leniency given to them by the state for testifying at the first trial. As a result, the judge decided that the recantations could be excluded under Rule 403 as "unfairly prejudicial," "self-serving," and "suspect."

Blackston appealed, and the Michigan Court of Appeals reversed and remanded for a third trial, holding that the trial court erred in refusing to allow evidence of recantation by Simpson and Zantello under both the state rules of evidence and the federal right of confrontation. *People v. Blackston*, No. 245099, 2005 WL 94796, at *5-*7, *8 n.3 (Mich. Ct. App. Jan. 18, 2005). The Michigan Supreme Court reversed the Court of Appeals, remanding with instructions to "evaluate the harmless error question by considering the volume of untainted evidence in support of the jury verdict." *People v. Blackston*, 705 N.W.2d 343, 343 (Mich. 2005). On remand, the Michigan Court of Appeals found that the error was not harmless and reaffirmed its order for a new trial. *People v. Blackston*, No. 245099, 2007 WL 1553688, at *1 (Mich. Ct. App. May 24, 2007). The Michigan Supreme Court again reversed the Court of Appeals, finding that it was not error to exclude the recantations and, in the alternative, that the state's other evidence rendered any error harmless. *People v. Blackston*, 751 N.W.2d 408, 413, 419 (Mich. 2008).

Unsuccessful in the state courts, Blackston sought federal habeas relief. The district court granted a conditional habeas writ on one of Blackston's claims, finding that Blackston's "Sixth Amendment right of confrontation and his Fourteenth Amendment right to due process were violated by the trial court's refusal to permit Petitioner to impeach the prior testimony of two key prosecution witnesses with their recanting statements." *Blackston v. Rapelje*, 907 F. Supp. 2d 878, 884 (E.D. Mich. 2012). This appeal followed.

**DISCUSSION**

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) limits federal habeas relief for violation of the right to confrontation, as well as other federal constitutional and statutory

rights, to cases involving state proceedings that "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

## I. Clearly Established Law

Under AEDPA, we must first determine whether there is "clearly established" law governing the case. *See Carey v. Musladin*, 549 U.S. 70, 74-77 (2006). Law is "clearly established" when Supreme Court precedent unambiguously provides a "controlling legal standard." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). "[C]learly established" law should be construed narrowly. *See Wright v. Van Patten*, 552 U.S. 120, 125 (2008); *Musladin*, 549 U.S. at 76. Nevertheless, "AEDPA does not 'require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied' . . . . The statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner." *Panetti*, 551 U.S. at 953 (quoting *Musladin*, 549 U.S. at 81 (Kennedy, J., concurring)).

> **A.** **There is a clearly established right to impeach the credibility of an adverse witness using the witness's own inconsistent statements.**

The state concedes the existence of a clearly-established "right under the Confrontation Clause to cross-examine a witness to probe that witness'[s] reliability and bias, which includes a right to impeach with inconsistent statements." Indeed, the Supreme Court's Sixth Amendment jurisprudence leaves no question about a criminal defendant's right under the Confrontation Clause to "impeach, i.e., discredit, the [state's] witness[es]." *Davis v. Alaska*, 415 U.S. 308, 316 (1974). Mere physical confrontation is not constitutionally adequate, because "one of the important objects of the right of confrontation [is] to guarantee that the fact finder had an adequate opportunity to assess the credibility of witnesses." *Berger v. California*, 393 U.S. 314, 315 (1969); *see also Greene v. McElroy*, 360 U.S. 474, 496-97 (1959). As a result, constitutionally adequate confrontation must include the meaningful opportunity to challenge the state's witnesses for "prototypical form[s] of bias." *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986). Such forms include the witness's criminal history or status as a parolee or probationer, *Davis*, 415 U.S. at 316, any immunity or plea deals between the witness and the state, *Van Arsdall*, 475 U.S. at 679, and other "prejudices, or ulterior motives" from which "jurors . . .

could appropriately draw inferences relating to the reliability of the witness." *Davis*, 415 U.S. at 316, 318; *see also Olden v. Kentucky*, 488 U.S. 227, 232 (1988). A witness's own inconsistent statements are among these "prototypical forms of bias" because they "undoubtedly provide[ ] valuable aid to the jury in assessing [witnesses'] credibility." *Harris v. New York*, 401 U.S. 222, 225 (1971); *see also Davis*, 415 U.S. at 316-17 ("[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." (citing *Greene*, 360 U.S. at 496)).

In general, challenges to the credibility of witnesses will occur through cross-examination because "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis*, 415 U.S. at 316. However, the Supreme Court has flatly "reject[ed] the view that the Confrontation Clause applies of its own force only to in-court testimony, and that its application to out-of-court statements introduced at trial depends upon 'the law of Evidence for the time being.'" *Crawford v. Washington*, 541 U.S. 36, 50-51 (2004) (quoting 3 J. Wigmore, Evidence § 1397, at 101 (2d ed. 1923)).

## B. The state's arguments against the existence of clearly established law are unconvincing.

The state challenges the existence of clearly established confrontation law. It argues that: (1) no "clearly established law . . . addresses the circumstance in which a State court concludes that prejudice warrants exclusion to vindicate the integrity of the judicial process," and (2) that the Confrontation Clause only guarantees a right to impeach through live cross-examination of witnesses who are physically present in the courtroom. We conclude that neither of these arguments seriously calls into question the constitutional right at issue here.

In support of its first argument, the state relies on *Mattox v. United States*, 156 U.S. 237 (1895). The defendant in that case was, like Blackston, twice convicted of murder. *See id.* at 240. Also as in Blackston's case, one of the witnesses against the defendant recanted his original testimony, then died, and thus became unavailable to testify at the second trial. *Id.* The Supreme Court held that the recantations were properly excluded in the second trial under a then-existing rule of evidence that barred admission of a witness's inconsistent statements except where the offering party first laid a foundation by calling the witness to explain the inconsistency. *Id.* at

249-50.  "The fact that the witness was dead was held not to change the rule."  *Id.* (citing *Hubbard v. Briggs*, 31 N.Y. 518, 536 (1865)).

As a holding that, by its own terms, merely interprets a rule of evidence, *Mattox* has little relevance to the present case.  The portion of the opinion cited by the state neither discusses the Confrontation Clause nor frames its decision in constitutional terms.  *See id.* at 245-50.  Nor does its holding remain good law even as an evidentiary matter:  "The *Mattox* rule"—with its requirement of laying a "foundation" before introducing inconsistent statements—is "long abandoned in federal court," *Whitley v. Ercole*, 642 F.3d 278, 289 (2d Cir. 2011), and has been rejected by both the Michigan and the Federal Rules of Evidence.  Indeed, in the advisory committee notes to Rule 806, the drafters single out the *Mattox* case for express disapproval.  Fed. R. Evid. 806 Advisory Committee's Note.

Perhaps recognizing this, the state argues that *Mattox*'s evidentiary holding should nonetheless be understood to embody Confrontation Clause principles because the *Mattox* Court discussed the Confrontation Clause elsewhere in the opinion (as part of a separate, constitutional holding not in dispute here).  But, such an unwarranted extension reads into the *Mattox* opinion something that simply is not there, because the proposition in *Mattox* on which the state relies is clearly and explicitly premised on common-law evidentiary principles, not constitutional ones. The Court laid down the rule after conducting a lengthy survey of common-law practices in this country and in England.  Its discussion of the foundation rule does not mention the Confrontation Clause (or, indeed, any constitutional provision or principle), and there is nothing to suggest that the *Mattox* Court intended to constitutionalize *sub silentio* the common law precedents on which it relied.  At any rate, even if *Mattox* could be read to stand for the principle that the right of confrontation may yield to a firmly rooted rule of evidence, this rule would have no place within the Supreme Court's modern confrontation jurisprudence.  *See Crawford*, 541 U.S. at 53-54.

Going to the state's broader argument—that the fear of "prejudice . . . [to] the judicial process" is a novel one and thus outside the realm of clearly established law—we find the argument misplaced.  The Supreme Court has in fact spoken to the situation where a state raises "legitimate interests in the criminal trial process" as a reason to curtail confrontation.  *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973) (citing *Mancusi v. Stubbs*, 408 U.S. 204 (1972)).

Tension between a defendant's right to "exposure of a witness'[s] motivation in testifying," *Van Arsdall*, 475 U.S. at 678 (quoting *Davis*, 415 U.S. at 316-17) (internal quotation marks omitted), and a trial court's latitude "to impose reasonable limits on such cross-examination based on concerns about, among other things, . . . prejudice," is not new. *Id.* That tension arises within the context of a clearly established legal landscape. Thus, the state's argument that the recantations were too prejudicial to permit exposure to the jury is better understood as falling under AEDPA's "unreasonable application" prong, and, accordingly, we address it in more detail in Part II below.

In support of its second "clearly established" argument—that there is no clearly established right to impeach testimonial hearsay through anything but live cross-examination—the state relies on the Supreme Court's decision last term in *Nevada v. Jackson*, 133 S. Ct. 1990 (2013). In that case, Jackson, a state prisoner, sought habeas relief from a conviction for sexual assault. *Id.* at 1990. The victim, his then-girlfriend, initially inculpated Jackson but later recanted her accusation. *Id.* at 1991. She then recanted the recantation and ultimately testified against Jackson at trial. *Id.* The defense attacked the witness's credibility extensively, cross-examining her regarding the initial recantation and also her past history of filing unsubstantiated police reports against Jackson. *Id.* Pursuant to a local rule of evidence, however, the state trial court refused to allow the admission of the police reports themselves into evidence, or to allow the defendant to call police officers to testify to the jury about them. *Id.* The local rule at issue required a defendant to provide the court with notice of his intent to introduce such evidence, and Jackson had failed to do so. *Id.* at 1993. The Ninth Circuit held that this rule violated the defendant's right to present a complete defense, *Jackson v. Nevada*, 688 F.3d 1091, 1097-1104 (9th Cir. 2012) (relying in part on *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)), but the Supreme Court reversed, *Jackson*, 133 S. Ct. at 1993-94, holding that:

> No decision of this Court clearly establishes that this notice requirement is unconstitutional. . . . The admission of extrinsic evidence of specific instances of a witness' conduct [i.e., the uncorroborated rape reports] to impeach the witness'[s] credibility may confuse the jury, unfairly embarrass the victim, surprise the prosecution, and unduly prolong the trial. No decision of this Court clearly establishes that the exclusion of such evidence for such reasons in a particular case violates the Constitution. . . . [T]his Court has never held that the

Confrontation Clause entitles a criminal defendant to introduce *extrinsic evidence* for impeachment purposes.

The state agrees that *Jackson* is relevant to this case only if Simpson's and Zantello's recantations are "extrinsic evidence" within the meaning of the decision. For several reasons, we have little difficulty concluding that the recantations are not extrinsic evidence. A leading treatise defines "[e]xtrinsic evidence of inconsistent statements" as "the production of *other witnesses'* testimony about the statements." 1 McCormick on Evid. § 36 (7th ed.) (emphasis added). The third-party documents and testimony at issue in *Jackson* certainly satisfy this definition. Likewise, the federal authorities cited in *Jackson* also involve third-party impeachment. *See Jackson*, 133 S. Ct. at 1994 (citing *Jordan v. Warden, Lebanon Corr. Inst.*, 675 F.3d 586, 597 (6th Cir. 2012) ("[T]he Confrontation Clause does not guarantee a criminal defendant the right to impeach one witness through the cross-examination *of another witness*, regardless of whether the testimony would address credibility or bias." (emphasis added)). In *Jackson*, too, the impeachment went only to a collateral matter—that is, the witness's conduct in filing police reports unrelated to the incident on trial. *Id.* In holding that the Confrontation Clause does not *require* that defendants be allowed to introduce extrinsic evidence of such collateral acts, the *Jackson* Court simply stated the corollary of its long-established rule that "the Confrontation Clause d[oes] not *prohibit* the introduction of '(d)ocumentary evidence to establish collateral facts.'" *Dutton v. Evans*, 400 U.S. 74, 97-98 (1970) (Harlan, J., concurring in result) (emphasis added) (quoting *Dowdell v. United States*, 221 U.S. 325, 330 (1911)) (emphasis added). Here, the witnesses' recanting statements do not go to their credibility on collateral matters, nor do they involve impeachment using other witnesses' testimony; rather, they directly undermine the veracity of testimony from the first trial using the recanting witnesses' own words.

We also note that the evidence in *Jackson* was excluded due to the defendant's failure to comply with the notice-and-hearing requirements of Nevada's rape-shield law. 133 S. Ct. at 1993. Such requirements were expressly held constitutional by the Supreme Court in *Michigan v. Lucas*, 500 U.S. 145, 152-53 (1991), and are without analogue in this case. Moreover, and perhaps more importantly, it is undeniable that in *Jackson* itself, the defendant's right to confront was fully and robustly satisfied; defense counsel in *Jackson* enjoyed "wide latitude to cross-

examine" at trial and used this opportunity to confront the witness with all of the impeachment material at issue in the case. 133 S. Ct. at 1991. Bringing in the reports themselves as extrinsic evidence would have added little to that record, and it is hardly a surprise that the Court found that exclusion for failure to satisfy the notice-and-hearing requirements fell short of a constitutional violation.

Resisting this conclusion, the state offers a competing definition of extrinsic evidence. It would define the term to encompass *all* forms of evidence other than in-person, face-to-face cross-examination. The witnesses' recantations meet this definition, the state argues, because the recantations are documents written on paper rather than statements spoken aloud during live cross-examination. But Blackston, unlike the petitioner in *Jackson*, has never sought to have the recantations themselves admitted as physical, documentary evidence; Blackston seeks only to have them recited to the jury in the same manner as Simpson's and Zantello's inculpatory testimony from the first trial. Perhaps anticipating this distinction, the state asserted at oral argument in this matter that even if not admitted as documentary evidence, the recantations still would constitute extrinsic evidence because a third party—namely, some courtroom official— would have to recite the absent witnesses' words to the jury. It strikes us as illogical, however, to posit that a witness becomes a third party to himself simply because his words are read to the jury by a court officer. Indeed, the testimony from Blackston's first trial was read to the second jury in precisely this manner, making it too "extrinsic evidence" under the state's overly broad definition.

There is a deeper problem with the state's position, however. In-person cross-examination is obviously possible only where the witness is physically available to testify in the courtroom and then elects to do so. Yet the Confrontation Clause applies not only to those witnesses who appear in court, but to *all* who "bear testimony" against the accused. *Crawford*, 541 U.S. at 51 (quoting 2 N. Webster, An American Dictionary of the English Language (1828)). Although the state does not contest that Simpson and Zantello "bore testimony" against Blackston, it nonetheless argues, in effect, that the Confrontation Clause has no purchase against them because of the manner in which the state presented their testimony to the jury. This position is untenable. It would render many forms of admissible testimonial hearsay immune

from challenge, thereby confounding the Confrontation Clause's goal of "ensuring that convictions will not be based on the charges of . . . unchallengeable [ ] individuals." *Kentucky v. Stincer*, 482 U.S. 730, 751 (1987) (quoting *Lee v. Illinois*, 476 U.S. 530, 540 (1986)); *see also* Advisory Committee's Notes on Fed. R. Evid. 806 ("The declarant of a hearsay statement which is admitted in evidence is in effect a witness. His credibility should in fairness be subject to impeachment and support as though he had in fact testified."). The Supreme Court has made clear that "[l]eaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless," *Crawford*, 541 U.S. at 51, and we do not think it plausible that the *Jackson* Court intended to adopt *sub silentio* the very outcome it rejected in *Crawford*. In short, we conclude that *Jackson* neither alters or abridges defendants' clearly established right to confront witnesses with their own inconsistent statements and other "prototypical form[s] of bias." *Van Arsdall*, 475 U.S. at 680; *see also Davis*, 415 U.S. at 315-16.

## II.  Unreasonable Application

Habeas relief is warranted under § 2254(d)'s "unreasonable application" clause when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410. Therefore, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 654 (2004)). Although "this standard is difficult to meet," AEDPA "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Id.* "Unreasonable application" deference is also tailored to the rule underlying the habeas claim: "'[T]he more general the rule' at issue—and thus the greater the potential for reasoned disagreement among fair-minded judges—'the more leeway [state] courts have in reaching outcomes in case-by-case determinations.'" *Renico v. Lett*, 559 U.S. 766, 776 (2010) (quoting *Yarbrough*, 541 U.S. at 654) (internal quotation marks omitted); *see also Harrington*, 131 S. Ct. at 786. In applying AEDPA's unreasonable-application clause, we are mindful of the Supreme Court's

admonishment that "[t]he text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts." *Crawford*, 541 U.S. at 54.

### A.      Evidence in the recantations was "prototypical impeachment material."

Blackston enjoys a clearly established right to impeach adverse witnesses in order "to show a prototypical form of bias on the part of witnesses, and thereby to expose 'to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" *Olden*, 488 U.S. at 231 (quoting *Van Arsdall*, 475 U.S. at 680); *see also Davis*, 415 U.S. at 318. A witness's own inconsistent statements, including recantations of prior inculpatory testimony, undeniably bear on a witness's bias and credibility, *United States v. Hale*, 422 U.S. 171, 176 (1975), as does "the exposure of a witness'[s] motivation in testifying," *Davis*, 415 U.S. at 316. Simpson's recantation was inconsistent with his trial testimony. It also explained his motivation in testifying falsely, namely, his allegation of prosecutorial threats to charge him with "obstructing justice [with] fourth degree habitual supplements, thus subjecting [him] to a life sentence," and receipt of threats by Lamp against his family. Zantello's recantation was also inconsistent with her trial testimony, and it too explained her motivations for testifying falsely. She said that she testified falsely against Blackston in exchange for dismissal of serious criminal charges against both herself and her then-boyfriend, whom she feared because he was abusive. This kind of impeachment evidence falls squarely within the Supreme Court's Confrontation Clause precedents. *See, e.g.*, *Olden*, 488 U.S. at 231-32 (confirming the right to impeach witness over motive to lie to protect romantic relationship); *Van Arsdall*, 475 U.S. at 680 (confirming the right to impeach over plea deal in exchange for testimony); *Alford v. United States*, 282 U.S. 687, 693 (1931) (confirming the right to show that a witness's "testimony was biased because given under promise or expectation of immunity, or under the coercive effect of his detention").

### B.      The state's rationales for denying confrontation are objectively unreasonable and fail to justify denying Blackston the right to impeach adverse witnesses.

Where the state court offers multiple justifications for its decision, "*each* ground" must be "examined and found to be unreasonable" before habeas relief is appropriate. *Wetzel v. Lambert*, 132 S. Ct. 1195, 1199 (2012). The state court advanced several theories in support of its

decision, and the state elaborates upon these theories in its briefing. These rationales, which overlap to some extent, include the following arguments: (1) that the recantations added cumulatively to impeachment from the first trial, rendering the first trial's confrontation constitutionally adequate, *see Blackston*, 751 N.W.2d at 415-17, (2) that the recantations were unfairly prejudicial to the prosecution and thus excludable under Rule 403, *see id.* at 414-15; (3) that the recantations represented a wrongful attempt to manipulate the justice system and perpetuate a fraud on the court, *see id.* at 414 n.18; and (4) that, as to Zantello, the exclusion of her recantation was not unreasonable because Blackston was able to confront her adequately at the second trial, *see id.* at 416. We address each ground in turn and conclude that none represents a reasonable basis for excluding the impeachment evidence.

>    **i.      Confrontation at Blackston's first trial was not constitutionally adequate because the recantations contained important new information and were not cumulative.**

The Michigan Supreme Court found, and the state argues, that Simpson and Zantello were confronted adequately at the first trial and that further impeachment based on the recantations would be "largely cumulative." Blackston, 751 N.W.2d at 415-17. However, the fact that some impeachment occurred at the first trial does not mean that the thwarted impeachment would have been immaterial or cumulative. Napue v. Illinois, 360 U.S. 264, 269 (1959) ("[W]e do not believe that the fact that the jury was apprised of other grounds for believing that the witness . . . may have had an interest in testifying against petitioner turned what was otherwise a tainted trial into a fair one.").

We conclude that the difference between the recantations and the impeachment at the first trial was one of kind, not degree, and that the state court was objectively unreasonable in concluding otherwise. First, the recantations were not cumulatively impeaching; no other evidence gave the jury any specific reason to believe that the witnesses were lying on the stand during the first trial. At most, impeachment at the first trial established that around the time of Miller's disappearance (more than ten years before trial) the witnesses made statements inconsistent with their trial testimony. Those earlier statements were fragmentary, poorly remembered, and internally contradictory, and in some cases the witnesses denied making them. In Zantello's case, the defense asked only a single question regarding an earlier statement of hers

said to exculpate Blackston, but Zantello denied any recollection of making this statement. Simpson was questioned more extensively about his statements from the time of Miller's disappearance, and he was willing to concede that he had at "different times . . . told different things," but these early accounts were scattered and contradictory. He had variously blamed Lamp, blamed one Kirk Pippens, and claimed that Miller was not actually dead. He denied making some of the statements ascribed to him by the defense. And, as the prosecution was quick to point out, he also had made early statements inculpating Blackston, on the basis of which the state argued that Simpson had always told "pretty much the same story" about the disappearance and murder.

By contrast, the witnesses' recanting statements specifically averred that their trial testimony was untrue, something the defense was able to suggest only obliquely at the first trial. In their recantations, the witnesses also "provided lengthy explanations for why they had lied," *Blackston*, 751 N.W.2d at 414, explanations that the defense did not, and could not, have used to impeach their reliability during cross-examination at the first trial. These explanations included Zantello's claim that her abusive boyfriend coerced her into testifying against Blackston in exchange for dismissal of his felony charges; the fact that Zantello's own criminal charges were dismissed in exchange for her testimony; Simpson's account of the prosecutor's threat to charge him as a habitual offender unless he incriminated Blackston; and Lamp's threats against Simpson's family. Simpson's description of the murder itself—that Lamp killed Miller with blows from a shovel—is also unique. The defense labored to prove that Miller died from blunt-force trauma rather than a gunshot, but had no basis (other than inconclusive expert testimony) to contest Simpson and Lamp's testimony that the murder was accomplished with a gun.[3]

Second, the Supreme Court has recognized that in the absence of any physical evidence, "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence." *Napue*, 360 U.S. at 269. Here, there was no physical evidence linking Blackston with the murder and, in such a situation, additional impeachment tending to tip the credibility balance cannot be brushed aside as cumulative. *See id.* The

---

[3]The state repeatedly argued in closing that "there is no evidence in this case whatsoever that this was not the result of a gunshot wound."

witnesses' credibility—particularly Simpson's—was critical to the state's case. At the second trial, the prosecution mentioned Simpson ten times in opening arguments and over 20 times in closing, four times telling the jury during closing arguments that Simpson's story was "entirely consistent the whole time, all the way up to the testimony you heard from a prior hearing." It would have been impossible for the prosecution to have characterized Simpson's reliability in this manner had the jury known that his trial testimony was bookended with inconsistent statements, both exculpatory to Blackston. That information would have added a great deal of substance and credibility to the defense's first-trial impeachment, and it was unreasonable to dismiss it as being merely cumulative. We return to this subject in our discussion of harmless error below.

### ii. Fear of causing prejudice to the prosecution was an objectively unreasonable basis for denying confrontation.

The state trial court and the Michigan Supreme Court found that the recantations' "undue prejudice outweighed their probative value," allowing for their exclusion under Michigan Rule of Evidence 403. *Blackston*, 751 N.W.2d at 411. Several concerns drove this Rule 403 reasoning: (1) that as "advocacy for acquittal," the recantations were excessively favorable to Blackston; (2) that the recantations unfairly impugned the prosecution and "inject[ed] the specter of prosecutorial corruption into the trial" in a manner that could not be rebutted through cross-examination, 751 N.W.2d at 415; and (3) that the recantations were inherently unreliable because they resulted from attempts to game the system through self-serving statements.

None of these concerns justifies excluding what the state concedes is admissible evidence and, as a result, Rule 403 is an objectively unreasonable basis for denying Blackston the right to confrontation. According to the Supreme Court, for example, "'[u]nfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Old Chief v. United States*, 519 U.S. 172, 180 (1997) (quoting Advisory Committee's Notes on Fed. R. Evid. 403). That former witnesses against Blackston are now advocating for Blackston's acquittal would undoubtedly cause "[s]erious damage to the strength of the State's case," *Davis*, 415 U.S. at 319, but that does not implicate the kind of *improper* unfairness envisioned by the drafters of Rule 403. *See Old Chief*, 519 U.S. at 180. There would be nothing improper about the jury's relying on the recanting statements to

conclude that Simpson and Zantello lacked credibility and that their testimony should be entitled to little substantive weight.

In addition, the state's concerns about the reputation of the prosecutor's office cannot trump a defendant's constitutional right to explore the pressure that office put on testifying witnesses. The Supreme Court's cases establish as much. *See Van Arsdall*, 475 U.S. at 679; *Alford*, 282 U.S. at 693. To the extent that the recantations contained genuinely prejudicial material regarding prosecutors' character or motivations, those sections "could have been redacted." *Blackston*, 751 N.W.2d at 414. But rather than redact the recantations to satisfy the state's concerns, the trial court "cut[ ] off all questioning about an event that the State conceded had taken place and that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony." *Van Arsdall*, 475 U.S. at 679. "[T]he State cannot, consistent with the right of confrontation, require the petitioner to bear th[is] full burden . . . ." *Davis*, 415 U.S. at 320.

Finally, whether or not the state courts were justified in some "skeptic[ism]" of Zantello's and Simpson's reliability, it was plainly a misapplication of Rule 403 to prevent the jury from hearing the recantations on that basis. The Confrontation Clause "is a procedural rather than a substantive guarantee," *Crawford*, 541 U.S. at 61, one that applies regardless of whether the judge is swayed personally by the material's substantive persuasiveness. Nor are mere reliability concerns under Rule 403 the sort of "paramount" state interests that would allow the exclusion of evidence, let alone trump a defendant's confrontation rights. *Davis*, 415 U.S. at 319-20. Perhaps the most telling remark by the state judge at the second trial was his decision to reject the recantations because he did not believe that the recantations were "credible." However, the question of witness credibility is the most fundamental issue that a jury resolves. It is quintessential material for the jury and, plainly, not within the province of the judge.

### iii. Witnesses' purported fraud-on-the-court does not trump defendant's right to confront.

Next, the state argues that it was reasonable to exclude the recantations because they were the product of the witnesses' "attempt[ ] to perpetrate a fraud on the court," by "ma[king] [themselves] unavailable for the second trial by being manipulative." As the state sees it, the

witnesses' "advocacy for acquittal," combined with their "contrived unavailability," is "an affront to justice, one that is unfairly prejudicial to the process." The state argues that it thus has a legitimate interest in "shield[ing] the judicial process from [such] contrived 'perjury.'"

As a variation on the well-known doctrine of forfeiture-by-wrongdoing, this theory also fails to establish an objectively reasonable basis for obstructing a defendant's right of confrontation. The Confrontation Clause recognizes "only those exceptions established at the time of the founding," which were limited to "the rule of forfeiture by wrongdoing," and "dying declarations." *Crawford*, 541 U.S. at 54, 56 n.6, 62. Because forfeiture by wrongdoing "extinguishes confrontation claims on essentially equitable grounds," *id.* at 62, the defendant's right to confront may be extinguished only by the *defendant's own* wrongful conduct. It is clearly established that Blackston may not lose his confrontation right based on the wrongdoing of third-parties. *Id.* (citing *Reynolds v. United States*, 98 U.S. 145, 158-59 (1878)). The state does not suggest that Blackston caused Simpson or Zantello to recant their testimony or to make themselves unavailable for trial. Therefore, any "wrongdoing" by the witnesses is insufficient to nullify Blackston's right to confront. *See Reynolds*, 98 U.S. at 158 (holding that the forfeiture doctrine requires a witness to be "absent by *his* [i.e., defendant's] own wrongful procurement" (emphasis added)).

### iv. The second cross-examination of Zantello was not constitutionally adequate.

Finally, the state argues that Blackston had a constitutionally adequate opportunity to confront Zantello at the second trial, confrontation that occurred after Zantello's first-trial testimony had been read to the jury. At that point, Zantello again took the stand and was briefly questioned by both sides. Consistent with her earlier behavior, she responded to each question with either a claim of memory loss or an assertion of Fifth Amendment privilege. At the very end of this cross-examination, Zantello and defense counsel had the following exchange:

> Q: Do you remember making a statement that Fred [Blackston] was home when you got home and that you had lied under oath originally because you had been threatened – your life was threatened by Mr. Lowder?
>
> A: No, I do not.

The court immediately intervened and cut off further questioning. The state contends that this exchange placed evidence of the recantation before the jury and, thus, provided Blackston with all the confrontation to which he was constitutionally entitled (at least with regard to Zantello).

This argument also fails. We cannot consider such a cursory and immediately-halted exchange constitutionally adequate. Posing futile questions to a non-responsive witness is not constitutionally adequate cross-examination, because "[c]onfrontation means more than being allowed to confront the witness physically." Davis, 415 U.S. at 315. Zantello failed to respond or even acknowledge the question in a meaningful way, and the judge's swift intervention robbed the exchange of whatever substance it might have enjoyed. We note that similarly flawed "questioning"—in which a lawyer recited facts into the record under the guise of questioning a non-responsive witness—received the Supreme Court's disapproval in Douglas v. Alabama, 380 U.S. 415, 416-17, 421 (1965) ("[E]ffective confrontation of Loyd was possible only if Loyd affirmed the statement as his. However, Loyd did not do so, but relied on his privilege to refuse to answer."). This rationale, too, was an objectively unreasonable basis for exclusion.

Moreover, upon retrial, the insufficiently justified denial of Blackston's right to effective cross-examination of Simpson and Zantello implicates more than simply the defendant's right to confront the witnesses arrayed against him. As the United States Supreme Court has recognized since at least 1948, "[a] person's right to . . . an opportunity to be heard in his defense—a right to his day in court—[is] basic in our system of jurisprudence." In re Oliver, 333 U.S. 257, 273 (1948) (cited in Chambers v. Mississippi, 410 U.S. 284, 294 (1973)). Indeed, the Constitution, through the Due Process Clause, "guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane, 476 U.S. at 690 (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)); see also Boggs v. Collins, 226 F.3d 728, 743 (6th Cir. 2000) (noting that "where procedural rules or trial court decisions have excluded evidence in a way that denies a defendant a fair trial, the Supreme Court has found a violation of that defendant's right to present a defense," a right that "emerges from the Sixth Amendment's Confrontation Clause and the Due Process Clause of the Fourteenth Amendment"). Here, the state trial court permitted the prosecution to introduce at retrial prior statements of two witnesses without allowing Blackston

the opportunity to present his defense to those accusations by explaining, through those witnesses' own words, the full context and legitimacy of the prior statements.  The deeply ingrained constitutional right to a fair trial cannot countenance allowing such a one-sided, prejudicial presentation of evidence to deprive an individual of liberty.  If any theme at all runs through the protections afforded by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, it is that we will not tolerate heavy-handed governmental attempts to skew the evidence placed before finders of fact in criminal prosecutions.  We today refuse to be party to abrogation of such a hallowed principle.

**III**.  **The Error Was Not Harmless.**

      **A.**      **Legal standard**

A violation of the Confrontation Clause does not warrant automatic reversal but, rather, is subject to harmless-error analysis.  *Van Arsdall*, 475 U.S. 681-82.  In the context of federal habeas corpus, a constitutional error will warrant relief only if the error "'had [a] substantial and injurious effect or influence in determining the jury's verdict.'"  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  This standard applies whether or not the state appellate court recognized the error.  *Fry v. Pliler*, 551 U.S. 112, 117 (2007) ("The opinion in *Brecht* clearly assumed that the *Kotteakos* standard would apply in virtually all § 2254 cases.").  The deferential posture of § 2254(d)(1) is understood to be "subsume[d]" within *Brecht* review, which is itself deferential.  *Fry*, 551 U.S. at 120.  When considering whether a Confrontation Clause violation was harmless under *Brecht*, we consider the factors laid out in *Van Arsdall*, 475 U.S. at 684.  "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt.  Whether such an error is harmless depends upon a host of factors . . ."  *Id.*  Those factors include: "the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of the cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."  *Id.*

Before discussing harmless error under this or any other standard, however, the state asks us to alter the circuit's approach to analyzing harmless error under *Brecht* and AEDPA. Specifically, the state requests that we deploy our "supervisory powers" to "require the district courts to follow a two-step process as a prudential matter," citing *Johnson v. Acevedo*, 572 F.3d 398, 404 (7th Cir. 2009). However, we have previously been presented with this proposal and have rejected it: "The answer in this Circuit is that *Brecht* is always the test, and there is no reason to ask both whether the state court 'unreasonably' applied [clearly established federal law] under the AEDPA and, further, whether the constitutional error had a 'substantial and injurious' effect on the jury's verdict." *Ruelas v. Wolfenbarger*, 580 F.3d 403, 412 (6th Cir. 2009).

The state also argues that *Harrington*, 131 S. Ct. 770, effectively overruled *Fry* and altered the familiar *Brecht* standard. *Harrington*, however, did not involve harmless error and cited neither *Fry* nor *Brecht*. Post-*Harrington*, we have continued to apply *Brecht* in the manner mandated by *Fry*. *See, e.g.*, *Jones v. Bagley*, 696 F.3d 475, 485 (6th Cir. 2012) *cert. denied*, 134 S. Ct. 62 (2013) (No. 12-9678) (applying *Brecht* post-*Harrington*). We adhere to that precedent here.

**B.      The error was not harmless under the *Brecht* and *Van Arsdall* standard.**

A careful review of the record and the last reasoned state-court opinion leaves little doubt that the constitutional error here had the "substantial and injurious effect or influence" required by *Brecht*. 507 U.S. at 623 (quoting *Kotteakos*, 328 U.S. at 776). In its opinion, the Michigan Supreme Court reached a contrary conclusion for three primary reasons. It found: (1) that the facts contained in the recantations were "largely cumulative," *Blackston*, 751 N.W.2d at 415-16; (2) that "the volume of untainted evidence against [Blackston] was significant," *id.* at 419; and (3) that Zantello's and Simpson's credibility was irrelevant, because their first-trial testimony "interlock[ed]" with the other evidence. *Id.* at 417.

We have already discussed the state's argument that the recantations were merely cumulative and have held that they were not. That analysis applies equally to the issue of harmless error. We now address the state's other two arguments in turn, by reference to the *Van Arsdall* factors cited above.

###    i.    Zantello and Simpson were critical to the state's case.

As our discussion has previously noted, Simpson's testimony was the linchpin of the state's case against Blackston. He was the first witness called by the state, and one of only two witnesses able to testify *directly* to Blackston's participation in the murder—all the other testimony consisted of admissible hearsay. Simpson was the only witness who testified he *actually saw* Blackston shoot Miller—Lamp testified that he handed Blackston a rifle, but claimed that it was too dark for him to see the actual shooting. As noted above, the prosecution referred to Simpson dozens of times in opening and closing arguments and repeatedly assured the jury that "Mr. Simpson was entirely consistent in what his version of the events was." These repeated references to Simpson and his testimony make it difficult to conclude that Simpson was not an important part of the prosecution's case. *See Van Arsdall*, 475 U.S. at 684. As also previously noted, no physical evidence linked Blackston to the murder. Witness testimony was therefore crucial. *See Napue*, 360 U.S. at 269.

Simpson's testimony was equally important for a second reason: it "reinforced and corroborated" Lamp's account of the murder. *Arizona v. Fulminante*, 499 U.S. 279, 299 (1991). Without Simpson's bolstering of Lamp's account, Lamp's credibility would not have been as strong.

Zantello's testimony was also important. She undermined Blackston's lone argument for acquittal: an "alibi defense [that] depended solely on the testimony of his three sisters." *Blackston*, 751 N.W. 2d at 419. Blackston's sisters testified that Blackston did not leave his house the night the murder occurred. In her trial testimony, Zantello flatly contradicted this alibi and was the only non-accomplice witness to do so. Her recanting affidavit, by contrast, corroborated the alibi testimony of Blackston's three sisters. Given these factual inconsistencies—and given the lack of non-accomplice testimony supporting the state's position—there seems little question that Zantello's testimony assisted the state in convincing the jury to disbelieve the defense's alibi witnesses. Indeed, as the state court itself reasoned, the jury likely found the testimony of Blackston's sisters "suspect because of their obvious bias in favor of their brother." *Id.* By contrast, Zantello was Blackston's long-time romantic partner, the mother of his four children, and someone the jury might have expected to come to his defense.

Her testimony undermining his alibi would have been particularly damaging and, logically, her recantation would have been equally harmful to the prosecution.

### ii. The state's remaining case against Blackston was weak.

Although recognizing that "Zantello's and Simpson's original inculpatory testimony certainly would strengthen the prosecution's case," *id.*, the state court determined that "the volume of untainted evidence against defendant was significant," *id.*, and "alone established beyond a reasonable doubt that defendant was at least an accomplice to first-degree, premeditated murder." *Id.* at 418. On appeal, the state describes the untainted evidence as "overwhelming" and "devastating." This characterization of the untainted evidence cannot withstand fair-minded scrutiny.

The record unambiguously establishes that the state's untainted case was not strong. It consisted solely of testimony by Lamp, Barr, and Mock. Lamp was an admitted accomplice to the murder. As such, he had an interest in shifting blame to Blackston. Indeed, Lamp's trial testimony makes clear that he, and not Blackston, played the leading role in planning and executing the murder. Lamp testified that it was his idea to kill Miller and that it was he who suggested the idea to Blackston, not the other way around. Lamp also chose the murder location (which was adjacent to his property), provided the weapon, dug the hole, and drove Miller to the ambush site. It was Lamp, not Blackston, who attempted to threaten Simpson into silence, and it was Lamp who finally resolved the mystery of Miller's disappearance by leading police to the burial site (Simpson had attempted to do so years earlier, but was unable to find it). Given the extent of Lamp's admitted involvement in the murder—and in light of the favorable deal he received from the state—a jury was unlikely to have credited his testimony without the benefit of Simpson's "reinforc[ing] and corroborat[ing]" account. *Fulminante*, 499 U.S. at 299.

The evidence presented by the state's other two witnesses against Blackston, the sisters Mock and Barr, was also weak. They testified that Blackston admitted to involvement in Miller's killing, but this testimony is dubious in at least two ways. First, both Mock and Barr admitted that they were intoxicated when Blackston made his admissions to them. Drunk witnesses are generally not reliable ones, as a witness's intoxication at the time of the events in question could affect the determination of the jury's verdict. Equally damaging is the fact that

the sisters contradicted each other's testimony in critical regards: according to Mock, Blackston admitted killing Miller and cutting off his ear; Barr, by contrast, testified that Blackston "never said that he shot [Miller]" but, instead, identified Lamp as the killer. Furthermore, Mock claimed that Blackston made a second admission to her at a party at Zantello's house, but Barr, who was present, could not recall any confession occurring at that time. The sisters were also both heavy drug users, and Barr admitted to using drugs the night before she gave testimony at trial.

The state-court opinion offered no reasoned answer to Mock's and Barr's credibility problems. Although recognizing that Mock and Barr were "always drinking when they were together," *Blackston*, 751 N.W.2d at 418 & n.27, the state court opinion made no attempt to address the likely impact of their intoxication on the reliability of their testimony. Likewise, the state court brushed aside as a "minor discrepanc[y]" the fact that Mock and Barr contradicted each other regarding the killer's identity, instead focusing on the sisters' agreement that Blackston had in some way "participated" in the killing. *Id.* But the state's entire theory of the case was that *Blackston* had killed Miller, and the identity of the killer is thus a critical fact that cannot be dismissed as a minor detail. Finally, the state court reached this conclusion only by applying an erroneous and unreasonably demanding legal standard. It reasoned that to establish harmful error, Blackston would need to show that "the jury would have *entirely* discredited Mock [and Barr]'s testimony." *Id.* at 418 n.27 (emphasis added). But the *Brecht* standard and *Van Arsdall* factors do not require proof that the state's untainted witnesses are *totally* unworthy of belief. We look to "the *overall* strength of the prosecution's case," *Van Arsdall*, 475 U.S. at 684, which remains weak whether the sisters' testimony is accorded modest weight or none at all. As a result, the negation of Simpson's and Zantello's far-more-damaging first-trial testimony would have had the "substantial and injurious" impact *Brecht* and *Fry* require.

### iii. The witnesses' credibility is not made irrelevant by the purportedly interlocking nature of the state's evidence.

The state court also found that "Simpson's and Zantello's inculpatory testimony . . . clearly coincided with the untainted evidence." *Blackston*, 751 N.W.2d at 419. On appeal, the state develops this statement into the argument that "[b]ecause [the state's] evidence was interlocking and there was no way it could have been coordinated, the case was not dependent on

the individual credibility of Simpson or Zantello." Because the witnesses' individual trustworthiness was irrelevant, the state argues, "any evidence undermining [Simpson's and Zantello's] credibility would have no bearing on the verdict." This argument is puzzling. Given the lack of physical evidence, it is clear that the verdict *depended* on which witnesses the jury found to be most credible. *See Napue*, 360 U.S. at 269. Furthermore, all of the witnesses in this case lived in close physical and social proximity to each other in a small town in rural Michigan. The notion that "there was no way [the witnesses' similar testimony] could have been coordinated" is unreasonable on its face.

In sum, given our resolution of the *Van Arsdall* factors, our only reasonable conclusion is that the constitutional error had the "substantial and injurious effect or influence in determining the jury's verdict" required under *Brecht* and *Fry*. The state court found otherwise, but for the reasons explained above, that decision was objectively unreasonable under AEDPA and *Harrington v. Richter*.

## CONCLUSION

In sum, we have found Blackston's confrontation rights to be clearly established by the decisional authority of the Supreme Court. We have also addressed each of the state's arguments justifying the denial of confrontation and found them objectively unreasonable. Finally, owing to the importance of the tainted witnesses to the state's case and the weakness of the state's other evidence, we must conclude that the constitutional error was not harmless. As a result, we AFFIRM the district court's conditional grant of a writ of habeas corpus.

---

**DISSENT**

---

KETHLEDGE, Circuit Judge, dissenting.   Although I agree with much of what the majority says in its opinion, one point of disagreement is dispositive.   To begin, Blackston's claim is that, under the Confrontation Clause, he was entitled to admit Simpson's and Zantello's recantations as evidence in his second trial.   The problem with that claim, at least on habeas review, is that not a single Supreme Court case holds that the Confrontation Clause guarantees *any* right to admit evidence—extrinsic or not—at trial.   Instead the Clause guarantees two things: first, the defendant's right to *exclude* certain out-of-court statements of a witness whom the defendant had no opportunity to cross-examine, *see Crawford v. Washington*, 541 U.S. 36, 68 (2004); and second, the defendant's right to *cross-examine* witnesses about matters especially important to their credibility, *e.g.*, their potential bias or motive to present false testimony at trial. *See Davis v. Alaska*, 415 U.S. 308, 318 (1974); *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986); *Olden v. Kentucky*, 488 U.S. 227, 230 (1988) (per curiam).

Neither right was violated here.   Under *Crawford*, Blackston undisputedly had no right to exclude from his second trial Simpson's and Zantello's testimony from the first, since Blackston's lawyer extensively cross-examined each of them about that very testimony. *See Crawford*, 541 U.S. at 68.   More to the point, *Davis*, *Van Arsdall*, and *Olden*, by their express terms, establish only a right of cross-examination—that is, a right to *pose certain questions* to a live witness at trial. *See Davis*, 415 U.S. at 313-14, 318 (defendant had right to question witness about his burglary conviction and probation status); *Van Arsdall*, 475 U.S. at 679 (defendant had right to question witness about the dismissal of charges against him); *Olden*, 488 U.S. at 229-30, 233 (defendant had right to question witness about her extramarital relationship).   And that right of cross-examination is simply different from a right to admit evidence, even evidence of a witness's own inconsistent statements.   Thus, the putative confrontation right that Blackston asserts here is not clearly established by the Supreme Court's precedents.

The majority's mistake in concluding otherwise, I respectfully suggest, is twofold.  First, the majority observes that "[l]eaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless[,]" op. at 17 (quoting *Crawford*, 541 U.S. at 51); and the majority then concludes that, if we were to deny habeas relief here, we would "adopt *sub silentio* the very outcome [the Court] rejected in *Crawford*," op. at 17.  But that conclusion does not follow.  In *Crawford,* the Supreme Court *itself* regulated the admission of out-of-court statements under the Confrontation Clause, when it held that, subject to certain exceptions not relevant here, "[t]estimonial statements of witnesses absent from trial" are admissible "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine."  541 U.S. at 59.  That standard is undisputedly met here.  Thus, a decision to deny relief in this case would not "leav[e] the regulation of out-of-court statements to the law of evidence[.]"  *Id*. at 51.  Instead, a decision to deny relief would leave the regulation of those statements to the standard set by the Supreme Court in *Crawford*—which, on habeas review, is where we are obliged to leave it.

The second mistake is similar.  For purposes of direct review, the majority's argument might be a strong one:  if Simpson and Zantello had offered live testimony in Blackston's second trial to the effect of their testimony in the first, there is little question that, under the *Davis* line of cases, Blackston would have had a right to cross-examine each of them about their recantations.  Only the fortuity of the witnesses' unavailability at the second trial prevented Blackston from exercising that right.  Thus, the majority concludes, the Confrontation Clause required admission of the recantations.

The problem, again, is that the *Davis* line of cases establishes only a right of cross-examination, not a right to introduce evidence.  *See supra.*  Thus, the majority's reasoning amounts to an extension of the holdings from those cases, rather than an application of them.  And that distinction is one the Court has spoken to directly.  "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* this Court's precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error."  *White v. Woodall*, 134 S. Ct 1697, 1706 (2014) (emphasis in original).  As I read *Woodall*, that is the end of the matter; but I add that there are reasonable arguments against

extending the *Davis* line of cases to require admission of the recantations at issue here. Those reasons include that, had the recantations been admitted, the prosecution would have had no ability to cross-examine Simpson or Zantello about them; and that Blackston's cross-examination of those witnesses in the first trial—the transcript of which was admitted as evidence in the second—was vigorous indeed.

I respectfully dissent.