NOT RECOMMENDED FOR PUBLICATION

No. 17-1061

UNITED STATES COURTS OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jun 12, 2018
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ANDREW JOHN MILLER, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| DUNCAN MACLAREN, Warden, | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF MICHIGAN |
| Respondent-Appellee. | ) | |
| | ) | |
| | ) | |

BEFORE:    SUHRHEINRICH, GIBBONS, and KETHLEDGE, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.**  This case arises out of the August 31, 2000 murders of Marinus and Sary Polderman, aged 93 and 91, respectively, and their daughter, Anna Lewis, aged 63.  Petitioner Andrew John Miller was convicted in Michigan state court of felony murder, perjury, and first-degree home invasion for his involvement in the murders.  He appealed his convictions, raising, among other arguments, the claim that his Confrontation Clause rights were violated when an unavailable witness's preliminary examination transcript was read to the jury at trial.  The state court affirmed his convictions and he filed a petition for a writ of habeas corpus, which was denied by the district court.  Because the Michigan state court's decision was not contrary to, or an unreasonable application of, clearly established federal law, we affirm the district court's judgment.

I.

A.

The Poldermans and Lewis were killed in a home invasion perpetrated by Andrew John Miller (the petitioner), his sister Brandy Miller ("Brandy," for ease of identification), Jerome Williams, Ben Platt, and Angela McConnell. Planning to steal money from the Poldermans, the group took Miller's truck and his mother-in-law's Lincoln to the residence, where Brandy and McConnell pretended to have car trouble in order to gain entry into the home. The men entered the residence shortly thereafter without permission. The attempted robbery devolved into violence when Mr. Polderman tried to get the group to leave the house. Miller and Williams started beating him and dragged him into the basement, while Brandy and McConnell struggled with Mrs. Polderman, who fell down the basement stairs. Miller then cut Mrs. Polderman's throat. Anna Lewis, who lived nearby and had arrived to drop off some groceries, came into the house, saw blood in the kitchen and started calling for her parents. McConnell hit her on the head several times with a tire iron, and Miller stabbed Lewis in the chest. The group left the Polderman residence, took showers at Miller's home, and burned their clothes. The seat cover in Miller's truck was also removed and burned.

After almost seven years, the police developed leads that finally led them to Miller, Brandy, Williams, Platt, and McConnell. During the investigation, Miller was summoned for two investigative subpoenas and gave statements to police on March 13, 14, and 15, 2007. He initially admitted that he had been at the Poldermans' house on the day of the murders, that the women had pretended to have car trouble to gain access, and that he had gone back to the house after the murders with Williams and Platt to wipe fingerprints and destroy evidence. At the end of his final

interview, though, Miller changed his story and denied that he had ever been at the Poldermans' house.

Miller and the four other group members were charged with the murders in 2007. Brandy and McConnell both entered into plea agreements in exchange for their cooperation, but McConnell withdrew her plea before Miller's trial. Before withdrawing her plea, she had testified under oath at Miller's preliminary hearing, where she was subjected to cross-examination.

B.

Miller's trial began on May 14, 2008. McConnell, who would be going to trial herself after the revocation of her plea, invoked her Fifth Amendment right against self-incrimination. The court declared her unavailable, so the prosecution sought to introduce her preliminary hearing transcript at trial. Miller moved to suppress the transcript, arguing that admitting it would violate his Confrontation Clause rights because, although he had been able to cross-examine McConnell at the preliminary hearing, he did not have the opportunity to cross-examine her about the withdrawal of her plea deal and her contention that her previous statements were lies. The court denied Miller's motion, finding that he had an adequate opportunity to cross-examine McConnell during the preliminary hearing. However, it agreed to allow the defense to read McConnell's letter recanting her testimony for impeachment purposes. It refused to allow the defense to introduce evidence of McConnell's formal plea withdrawal because it found that such evidence would be more unfairly prejudicial than probative under Rule 403 and was not relevant to McConnell's character for truthfulness. *See* Mich. R. Evid. 403.

At trial, McConnell's preliminary hearing testimony was read to the jury in the following manner: the prosecutor and defense counsel read the questions that they had asked McConnell, and another person read the answers that she had given. Miller's attorney also read the questions

that another defendant's attorney had asked her on cross-examination during the preliminary hearing. McConnell's letter of recantation was also read to the jury, although certain statements were redacted to exclude information about her formal plea withdrawal. The version read to the jury still included many statements that McConnell fabricated her testimony, such as: "I have lied. I went with the stories that I have been told"; "I was spoon fed these stories"; and "I have lied about everything that I have testified to." CA6 R. 16, Appendix: Jury Trial Vol. 5 Excerpt, at 116. The letter read to the jury also claimed that McConnell was told by her attorney that she should plead guilty because she "would not be able to beat the case," and that she "was scared and told that [she] would never see [her] kids or family outside of bars." *Id.* at 117.

In accordance with her plea agreement, Brandy Miller testified at her brother's trial, and her testimony implicated Miller's direct involvement in the murders. She stated that she was in the Polderman house with Miller, Williams, Platt, and McConnell. She testified that she saw Miller and Williams forcing Mr. Polderman from the back bedroom towards the front of the house, and that Mr. Polderman had a bleeding cut on his forehead. She stated that after Mr. Polderman tried to reach for the phone, he was "attacked again in the kitchen" by Miller and Williams, who then dragged him into the basement, where she later saw him on the ground and "there was a lot of blood." CA6 R. 16, Appendix: Jury Trial Vol. 3 Excerpt, at 103–04. She also testified that Miller cut Mrs. Polderman's throat after she fell down the stairs.

The jury heard and saw excerpts from the recordings of the March 2007 interviews between Miller and the police. Additionally, another witness, Nathan McDaniel, testified that he had been an inmate at the Kalamazoo County Jail with Miller, and Miller confessed to him that he was involved in the murders and that he took a .22-caliber rifle from the home. *People v. Miller*, No. 286580, 2010 WL 1629084, at *4 (Mich. Ct. App. 2010).

On May 22, 2008, the jury convicted Miller of three counts of felony murder, one count of perjury, and one count of first-degree home invasion. He was sentenced to life in prison without the possibility of parole. Miller appealed his convictions and raised several issues, including the argument that the admission of McConnell's statement violated his Confrontation Clause rights. *Miller*, 2010 WL 1629084, at *1. The Michigan Court of Appeals affirmed his convictions, holding that "[a] review of the record indicates that defense counsel effectively cross-examined McConnell on all of the relevant aspects of the case and attacked McConnell's credibility at the preliminary examination." *Id.* at *1, *7. Miller also was able to impeach McConnell at trial by reading her letter recanting her testimony into evidence, and he "fail[ed] to show how any cross-examination concerning the letter would not have been duplicative of the contents of the letter itself." *Id.* at *1. Miller then filed for leave to appeal to the Michigan Supreme Court, which denied his petition. *People v. Miller*, 794 N.W.2d 35, 36 (Mich. 2011).

C.

In February 2012, Miller filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The magistrate judge recommended denying the petition, and the district court adopted the report in full. The district court also denied a certificate of appealability. This court subsequently granted a certificate of appealability with respect to his Confrontation Clause claim.

II.

This court "review[s] the district court's legal conclusions in a habeas proceeding de novo and its factual findings under the clear-error standard." *Davis v. Lafler*, 658 F.3d 525, 530 (6th

Cir. 2011). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), we may not grant a state prisoner habeas relief unless the state court's determination:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). AEDPA presents a very difficult standard for habeas petitioners to meet. *See, e.g.*, *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) ("AEDPA's standard is intentionally difficult to meet." (internal quotation marks and citation omitted)); *Burt v. Titlow*, 571 U.S. 12, 19 (2013) ("AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court."). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004)).

### III.

Miller argues that the admission of McConnell's preliminary examination transcript entitles him to habeas relief because it is clearly established federal law that a preliminary examination never affords a defendant the opportunity for adequate cross examination, or, in the alternative, under the specific facts of his case he was not afforded an adequate opportunity for cross examination, and the state court's determination was an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d). Miller fails to meet AEDPA's high bar, since he cannot show that there is clearly established federal law supporting his arguments. Furthermore, even if there was error, it was harmless because Miller was able to impeach McConnell's credibility at trial by reading her recantation letter to the jury, and there was ample

additional evidence of Miller's involvement in the murders, including eyewitness testimony from Miller's sister and incriminating statements made by Miller himself.

A.

"Identifying clearly established federal law is . . . the 'threshold question under AEDPA.'" *Dewald v. Wriggelsworth*, 748 F.3d 295, 299 (6th Cir. 2014) (quoting *Williams v. Taylor*, 529 U.S. 362, 390 (2000)). In determining what constitutes clearly established federal law, "we must consult 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Id.* (quoting *Carey v. Musladin,* 549 U.S. 70, 74 (2006)) (alteration in original).

The Sixth Amendment states: "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. CONST. amend. VI. Certain Sixth Amendment principles are, without a doubt, clearly established in federal jurisprudence. *Crawford v. Washington* provides the governing standard for admission of testimonial hearsay in a criminal trial: "the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." 541 U.S. 36, 68 (2004). Both parties agree that McConnell was unavailable. Thus, the only issue is whether Miller had a prior opportunity to cross-examine McConnell. The question then becomes how clearly established federal law defines "prior opportunity to cross-examine."

The Confrontation Clause "has long been read as securing an adequate opportunity to cross-examine adverse witnesses." *United States v. Owens*, 484 U.S. 554, 557 (1988). Miller argues that under clearly established federal law, a preliminary examination *never* affords the required "adequate opportunity" for cross-examination, quoting the following statement from the Supreme Court decision in *Barber v. Page*:

> The right to confrontation is basically a trial right. . . . A preliminary hearing is ordinarily a much less searching exploration into the merits of a case than a trial, simply because its function is the more limited one of determining whether probable cause exists to hold the accused for trial.

390 U.S. 719, 725 (1968). In *Barber*, a witness testified at the petitioner's preliminary hearing and the petitioner chose not to cross-examine him at that time. *Id.* at 720. At the time of trial, the witness was incarcerated over 200 miles from the trial court, and the state argued that this distance rendered him unavailable. *Id.* The Court held that admission of the witness's preliminary hearing transcript violated the petitioner's Confrontation Clause rights. *Id.* at 721.

Miller's interpretation of *Barber*—as establishing a clear rule that preliminary hearings never provide an adequate opportunity for cross-examination—is incorrect. First, *Barber*'s statements about the nature of the right to confrontation left room for exceptions. The Court stated that the confrontation right is "basically" a trial right, and that a preliminary examination hearing is "ordinarily" less probing into the merits than a trial. *Id.* at 725. Additionally, the *Barber* petitioner had not actually exercised his right to cross-examine the witness at the preliminary hearing. *Id.* at 720. More importantly, the witness in *Barber* was not, in fact, unavailable; instead, the State had failed to make a "good-faith effort to obtain his presence at trial." *Id.* at 724–25. The Court noted that there could be exceptions in different circumstances: "[w]hile there may be some justification for holding that the opportunity for cross-examination of a witness at a preliminary hearing satisfies the demand of the confrontation clause where the witness is shown to be actually unavailable, this is not, as we have pointed out, such a case." *Id.* at 725–26.

Indeed, in a case decided just two years later, the Court was careful to emphasize that *Barber* left space for exceptions, holding that where a witness was uncooperative on the stand at trial, admission of the witness's preliminary hearing testimony was not prohibited by the Sixth Amendment. *California v. Green*, 399 U.S. 149, 151–52, 166 (1970). Therefore, it is not "clearly

established law" that a preliminary hearing never provides an adequate opportunity for cross-examination; on the contrary, the law is clear that sometimes it *can* provide such an opportunity.

Furthermore, this circuit has already rejected the argument that Miller now makes. In *Williams v. Bauman*, we held that the petitioner's "suggestion that his preliminary hearing categorically did not afford him an adequate opportunity to cross-examine" failed under AEDPA because he did not "identify any Supreme Court precedent supporting his contention." 759 F.3d 630, 635–36 (6th Cir. 2014). While the efficacy of cross-examination during a preliminary hearing may be debatable, "[i]f there is room for reasonable debate on the issue, the state court's decision to align itself with one side of the argument is necessarily beyond th[e] court's power to remedy under § 2254, even if it turns out to be wrong." *Id.* at 636. Similarly, in *Al-Timimi v. Jackson*, we held that while "the Supreme Court has acknowledged that a preliminary hearing generally involves a less searching exploration into the merits of a case than does a trial[,] . . . . this statement was dicta, not clearly established law for the purposes of AEDPA." 379 F. App'x 435, 438 (6th Cir. 2010) (internal citation omitted). Finally, at least two other circuits have rejected habeas petitioners' claims that introduction of unavailable witnesses' preliminary examination transcripts violated their Confrontation Clause rights. *See Howell v. Trammell*, 728 F.3d 1202, 1215–18 (10th Cir. 2013); *Maxwell v. Roe*, 628 F.3d 486, 491 n.1 (9th Cir. 2010).

Thus, the only clearly established federal law that is applicable here is *Crawford*'s mandate that where testimonial hearsay is admitted, the declarant must have been unavailable and the defendant must have had a prior opportunity to cross-examine the declarant. *See* 541 U.S. at 68.

B.

Next, we must decide whether the state court's decision was contrary to, or an unreasonable application of, *Crawford*'s requirement that Miller must have had a prior opportunity to adequately

cross-examine McConnell. Miller argues that the state courts unreasonably applied federal law because under the facts of his case, he was not afforded an adequate opportunity to cross-examine McConnell. McConnell's recantation of her original testimony and formal plea withdrawal, he claims, raised new factual issues that could not have been subject to cross-examination during the preliminary hearing.

"A state court judgment is the result of an unreasonable application of clearly established law for AEDPA purposes when the state court 'correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case.'" *Hill v. Anderson*, 881 F.3d 483, 490 (6th Cir. 2018) (quoting *Williams*, 529 U.S. at 408–09). A state court's decision is only an unreasonable application of clearly established law where it is "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003)). "The Supreme Court has repeatedly instructed that a state court's resolution of an issue is not necessarily unreasonable, even if it is incorrect." *Williams*, 759 F.3d at 635. We hold that the Michigan court did not "unreasonably apply" *Crawford*'s requirement that a defendant have a prior opportunity to adequately cross-examine an unavailable declarant.

Miller relies primarily on our case *Blackston v. Rapelje* for his argument that the state court's decision was an unreasonable application of clearly established federal law. In *Blackston*, the petitioner was granted a retrial, but two of the prosecution's key witnesses recanted their testimony via written statements before the second trial. 780 F.3d 340, 346 (6th Cir. 2015). The judge declared them unavailable at trial since they refused to respond to questioning and ordered their testimony from the petitioner's first trial read into the record. *Id.* at 346–47. The judge also overruled the defense's request that the witnesses' recanting statements be read to the jury. *Id.* at

347. A panel of this court affirmed the district court's conditional grant of a writ of habeas corpus, holding that the petitioner's Confrontation Clause rights were violated and that the error was not harmless. *Id.* at 362. We concluded that "[t]here is a clearly established right to impeach the credibility of an adverse witness using the witness's own inconsistent statements." *Id.* at 348. Because the witnesses' recantations were inconsistent with their trial testimony and were "prototypical impeachment material," the state court's decision to exclude the statements unreasonably denied the petitioner that right. *Id.* at 353–54.

*Blackston* is easily distinguishable, as it only recognized a clearly established right to impeach witnesses—and here, Miller was able to do just that. Unlike the petitioner in *Blackston*, Miller's defense *was* permitted to read McConnell's recantation letter into the record. The jury heard her statements, "I have lied. . . . I was told these lies by the detective . . . . I was spoon fed these stories and told that someone else told this by the detectives." CA6 R. 16, Appendix: Jury Trial Vol. 5 Excerpt, at 116. The fact that Miller was unable to introduce evidence of McConnell's formal plea withdrawal does not run afoul of *Blackston* because, as the district court noted, her plea withdrawal in and of itself had nothing to do with her character for truthfulness. *See Nevada v. Jackson*, 569 U.S. 505, 512 (2013) ("[T]his Court has never held that the Confrontation Clause entitles a criminal defendant to introduce *extrinsic evidence* for impeachment purposes."). What mattered for impeachment purposes were McConnell's statements that she had lied, and the jury heard those statements.

Moreover, Miller was not denied the ability to effectively cross-examine McConnell simply because he was unable to cross-examine her about her plea withdrawal. He cross-examined her extensively at the preliminary hearing, he was able to introduce her letter of recantation at trial, and he points to no Supreme Court precedent that would support his argument that the

Confrontation Clause requires the ability to cross-examine an unavailable witness about her inconsistent statements *when those statements were read to the jury*. In fact, there is language from *Green* that points to the opposite conclusion: "The most successful cross-examination at the time the prior statement was made could hardly hope to accomplish more than has already been accomplished by the fact that the witness is now telling a different, inconsistent story, and—in this case—one that is favorable to the defendant." 399 U.S. at 159. Here, it is not clear what else Miller would have accomplished by cross-examining McConnell about her plea withdrawal. Indeed, such cross-examination could have been counter-productive, because McConnell's new version of events was favorable to Miller. Miller is asking this court not to apply *Blackston*, but to expand it and create a new right. And a newly-created right cannot be "clearly established," nor can it be announced on habeas review.

Because the state court's decision comports with clearly established federal law, in that McConnell was unavailable, Miller had a prior opportunity to cross-examine McConnell, and he was able to impeach her by reading her inconsistent statements to the jury, Miller cannot show that there was constitutional error that warrants habeas relief.

IV.

Even if there was constitutional error, Miller is not entitled to habeas relief unless he can show that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). A "substantial and injurious effect or influence" means "actual prejudice." *See id.* at 637–38; *see also, e.g.*, *Fry v. Pliler*, 551 U.S. 112, 119 (2007); *Gover v. Perry*, 698 F.3d 295, 299 (6th Cir. 2012). "The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the

error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *O'Neal v. McAninch*, 513 U.S. 432, 438 (1995) (quoting *Kotteakos*, 328 U.S. at 764–65) (emphasis omitted). Miller fails to meet *Brecht*'s "substantial and injurious effect" requirement.

Any error from admitting McConnell's preliminary examination testimony was mitigated by admission of her recantation statement, where she repeatedly asserted that she lied. In fact, her recantation letter explicitly states: "I have lied"; "I was spoon fed these stories"; "I have lied about everything that I have testified to." CA6 R. 16, Appendix: Jury Trial Vol. 5 Excerpt, at 116. She stated specifically that she fabricated all of her testimony about the events in the Polderman house: "[A]nother lie that I told was that I seen [sic] Jerome, Ben, and Andrew [Miller] come out of the house with blood on them. I was never there to see anyone [sic] of them come out of the house at all." *Id.* at 117. At the very least, those statements cast serious doubt on McConnell's credibility, making it less likely that the jury would rely heavily on her preliminary examination testimony when deciding whether Miller was guilty.

Further, although courts are instructed not to conduct a bare sufficiency of the evidence inquiry when determining whether the error had a substantial and injurious effect on the verdict, we note that the other evidence introduced against Miller was more than adequate to support his conviction. Brandy testified against Miller in court, describing the murders and Miller's role in them in great detail (and it's worth remarking that Brandy was testifying against her own brother, whereas McConnell had no such familial relationship with Miller). Miller also admitted to police officers that he had been at the Poldermans' house on the day of the murders, that the women had pretended to have car trouble to gain access, and that he had gone back to the house after the murders with Williams and Platt to wipe fingerprints and destroy evidence. The jury heard and saw recordings from these interviews with police. The jury also heard from Nathan McDaniel,

who had been an inmate at the Kalamazoo County Jail with Miller, and who testified that Miller confessed to involvement with the murders. *Miller*, 2010 WL 1629084, at *4. Even without McConnell's testimony, there was ample evidence for a jury to find Miller guilty beyond a reasonable doubt. Since McConnell's statement of recantation was read to the jury, mitigating any error introduced by reading her preliminary hearing testimony, and there was abundant additional evidence implicating Miller in the crimes, we conclude that any error was harmless and did not have a "substantial and injurious effect or influence" on the verdict.

V.

We therefore affirm the judgment of the district court.