RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0108p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

JOSEPH THOMAS REINER,

*Petitioner-Appellant,*

*v.*

JEFFREY WOODS, Warden,

*Respondent-Appellee.*

No. 18-1413

─────────────

Appeal from the United States District Court
for the Western District of Michigan at Marquette.
No. 2:15-cv-00125—Robert J. Jonker, District Judge.

Argued:  March 10, 2020

Decided and Filed:  April 7, 2020

Before:  CLAY, ROGERS, and GRIFFIN, Circuit Judges.

─────────────

**COUNSEL**

**ARGUED:**  Matthew C. Tymann, WILMER CUTLER PICKERING HALE AND DORR LLP, Los Angeles, California, for Appellant.  Jared D. Schultz, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.  **ON BRIEF:**  Matthew C. Tymann, WILMER CUTLER PICKERING HALE AND DORR LLP, Los Angeles, California, for Appellant.  Jared D. Schultz, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

———————————

**OPINION**

———————————

GRIFFIN, Circuit Judge.

In this habeas case brought under 28 U.S.C. § 2254, both parties agree that the admission of testimonial hearsay statements during petitioner Joseph Reiner's murder trial in Michigan state court violated his Sixth Amendment right to confront his accusers (because the declarant was never available for cross-examination). The Michigan Court of Appeals made that same determination on direct review. The issue on appeal is whether that error was harmless.

A review of the evidence presented at Reiner's trial paints the picture of a circumstantial case lacking physical evidence or eyewitness testimony placing Reiner at the crime scene. The statements that gave rise to the Sixth Amendment violation here served as the linchpin of the government's case, connecting Reiner to the fruits of the crime in a way no other evidence, testimonial or physical, could. Without those statements, the prosecution's case becomes significantly weaker, such that "grave doubt" exists as to whether their admission had a "substantial and injurious effect or influence in determining the jury's verdict." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (citation omitted). We therefore reverse the district court's denial of Reiner's § 2254 petition and remand for further proceedings.

I.

Reiner's "convictions arise from the February 23, 2011[ ] home invasion of 49199 Fairchild Road in Macomb County, where 69-year-old Joanne Eisenhardt lived." *People v. Reiner*, No. 313854, 2014 WL 1515371, at *1 (Mich. Ct. App. Apr. 17, 2014) (per curiam).[1] Eisenhardt was stabbed in the neck with two knives and jewelry was taken from the house, including a ring from Eisenhardt's finger. Eisenhardt survived the stabbing, but she "suffered declining health after the incident and died seven months later." *Id.* Police officers in New York apprehended Reiner on February 26, 2011, on suspicion of driving a stolen vehicle stemming

———————————

[1]In a § 2254 proceeding, a state court's factual determinations are "presumed to be correct." 28 U.S.C. § 2254(e).

from a separate incident. He was returned to Michigan to stand trial for the home invasion and stabbing.

At trial, the prosecution sought to introduce several statements of a pawn shop owner named Hadrian Lewandowski. The Michigan Court of Appeals described his statements thus:

> [A]fter [Detective] Ernatt visited the Gold Shop on February 24, 2011, Lewandowski called him and left a voicemail message. In the message, Lewandowski identified defendant as a person who had been in the Gold Shop the previous day. . . .
>
> After being shown a photograph of defendant, Lewandowski told Ernatt that defendant had been in the Gold Shop on the day of the home invasion. He further said that defendant had thrown "some items" on the counter and asked if they were worth anything. In addition, after Ernatt looked in the tin can where Lewandowski kept the scrap and costume jewelry and saw a ring that matched a description given to him as one that was stolen from Eisenhardt, and which was subsequently identified by Eisenhardt's granddaughter as belonging to Eisenhardt, Lewandowski said that it was possible that defendant had brought in the ring. Lewandowski told [Sergeant] Willis that defendant, on his last visit to the Gold Shop, which was between 11:00 a.m. and 12:00 p.m., had pawned the ring and a necklace with a magnifying glass. Then, after [Detective] Hanna followed Lewandowski to his house to retrieve the necklace, Lewandowski told Hanna, when he handed over the necklace, that it was the necklace that defendant had pawned.

*Id.* at *4. Lewandowski died before trial, however, and Reiner never had an opportunity to cross-examine him. *Id.* at *3 n.2, *4. The prosecutor sought to introduce Lewandowski's statements during the testimony of the law enforcement officers he had spoken to. Reiner objected, arguing that these statements would violate his Sixth Amendment right to confront his accusers. The trial court overruled the objection and held "that Lewandowski's statements, although testimonial, were not barred by the Confrontation Clause because they would be used to explain why the police acted as they did and how they came to investigate defendant." *Id.* at *3.

Lewandowski's statements played a prominent role in the prosecution's case. The prosecution did not present any physical evidence (like fingerprints or DNA) placing Reiner at the crime scene, and eyewitness testimony only placed him in the general area at around the time of the home invasion and stabbing. During opening statements and closing arguments, the prosecutor argued several times that Reiner's possession of Eisenhardt's jewelry at the Gold

Shop provided strong evidence that he had attacked her earlier that day. And Lewandowski's statements—which the prosecutor also discussed repeatedly—provided the strongest (if not the only) evidence that Reiner possessed Eisenhardt's jewelry.

The jury convicted Reiner "of assault with intent to murder, MCL 750.83; first-degree home invasion, MCL 750.110a(2); and felony murder, MCL 750.316(1)(b)." *Id.* at *1. The trial court sentenced him "to concurrent prison terms of 450 to 720 months for the assault with intent to murder conviction, 150 to 240 months for the home invasion conviction, and life imprisonment for the murder conviction." *Id.*

The Michigan Court of Appeals affirmed Reiner's convictions on direct review, rejecting Reiner's argument that the admission of Lewandowski's statements warranted a new trial. The court first addressed Lewandowski's statement to Detective Ernatt in a voicemail message. "In the message, Lewandowski identified [Reiner] as a person who had been in the Gold Shop the previous day." *Id.* at *4. The court held that this statement's admission did not violate the Confrontation Clause because "it was offered as background evidence to explain why Ernatt acted as he did in returning to the Gold Shop on February 25, 2011, to conduct further investigation." *Id.* Reiner does not challenge the introduction of this statement.

As for the remainder of Lewandowski's statements to the police, the court held that they were inadmissible hearsay:

> The statements, which show that defendant was in the Gold Shop on the day of the home invasion and that he pawned jewelry, which may have or did include the ring that belonged to Eisenhardt, were strong circumstantial evidence that defendant was the perpetrator of the home invasion. The statements went to the very heart of the prosecutor's case and therefore, were used for the truth of the matter asserted.

*Id.* The court also held that the statements were testimonial and noted that Reiner had no opportunity to cross-examine Lewandowski. *Id.* Thus, "the admission of Lewandowski's statements on February 25, 2011, to Ernatt, Willis, and Hanna violated [Reiner's] right of confrontation." *Id.*

But the court also held that the trial court's error was harmless beyond a reasonable doubt because "[t]here was evidence other than Lewandowski's statements that connected defendant to the Gold Shop on February 23, 2011, the day of the home invasion." *Id.* at *5. Specifically, the court cited the following evidence presented at trial:

- The signature on a receipt (or "purchase order") from the Gold Shop dated February 23, 2011, which "[a]s argued by the prosecutor at trial," matched the signatures from two previous Gold Shop receipts bearing Reiner's name and thumbprint. *Id.*

- Eyewitness Allen Pauli's testimony "that he saw defendant walking north on Fairchild Road at approximately 9:50 a.m. on February 23, 2011. Pauli thought it was unusual for defendant to be walking on Fairchild Road because the area was remote and it was very cold outside." *Id.*

- Eyewitness Thomas Kosciolek's testimony "that he saw defendant walking east on 22 Mile Road" and gave him a ride to a bus stop, that "defendant was sweating terribly and, once in Kosciolek's vehicle, he never took off his hat and gloves and never looked at Kosciolek," and that "Defendant told Kosciolek that he had been visiting a girl in a nearby trailer park, but [Detective] Stevens never located anybody in the trailer park who knew defendant." *Id.*

- Reiner's statement to police in New York, following his arrest for stealing a car in a separate incident, that there was "some big shit" in Michigan that he would deal with when he returned there. *Id.*

Based on this evidence, the court concluded that "it is clear beyond a reasonable doubt that a rational jury would have found defendant guilty absent the trial court's error in admitting Lewandowski's February 25, 2011 statements to Ernatt, Willis, and Hanna." *Id.*

After the Michigan Supreme Court denied Reiner's pro se application for leave to appeal, *People v. Reiner*, 856 N.W.2d 38 (Mich. 2014) (order), Reiner filed a pro se § 2254 petition in the district court, raising four grounds for relief. The magistrate judge issued a report and recommendation recommending that the court dismiss the petition and deny any subsequent application for a certificate of appealability. *Reiner v. Woods*, No. 2:15-CV-125, 2017 WL 8222209, at *8 (W.D. Mich. Dec. 13, 2017) (report and recommendation). After Reiner filed timely objections, the district court adopted the report and recommendation and dismissed the petition, but granted a certificate of appealability as to Ground III, which argued that "[t]he Court denied Petitioner his 6th Amendment right of confrontation and his right to due process by

erroneously allowing into evidence hearsay statements by pawn broker Hadrian Lewandowski, who was deceased." *Reiner v. Woods*, No. 2:15-CV-125, 2018 WL 1305784, at *2–4 (W.D. Mich. Mar. 13, 2018).

Reiner timely appealed, filed a pro se brief in this court, and moved for the appointment of counsel. We granted that motion and a second round of briefing followed.

## II.

"This Court reviews de novo the legal conclusions involved in the district court's decision to deny the writ under § 2254, and reviews for clear error its findings of fact." *Palazzolo v. Gorcyca*, 244 F.3d 512, 515 (6th Cir. 2001).

## III.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315–16 (1974) (citation omitted). The Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004). It operates independently from the hearsay rule. *Id.* at 50–51; *see* Fed. R. Evid. 801. Statements are "testimonial" "when the circumstances objectively indicate . . . that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution," rather than to enable the assistance of law enforcement to respond to an ongoing emergency. *Davis v. Washington*, 547 U.S. 813, 822 (2006) (footnote omitted).

Here, the Michigan Court of Appeals found that most of Lewandowski's statements to law enforcement were testimonial hearsay. *Reiner*, 2014 WL 1515371, at *4. And because Lewandowski died a few months after giving them, he was unavailable to testify at trial and Reiner never had an opportunity to cross-examine him. *Id.* The court therefore held that the admission of those statements violated the Confrontation Clause. *Id.* And the state rightly

concedes in its brief that Reiner's "rights were violated when statements from the jewelry dealer were admitted into evidence."

## IV.

Confrontation Clause violations do not require automatic reversal, and are instead subject to harmless-error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967). Under *Chapman*, the government bears the burden of establishing that a constitutional error was harmless. *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991).

On collateral review, however, "the test is different." *Davis v. Ayala*, 135 S. Ct. 2187, 2197 (2015). Habeas petitioners must have suffered "actual prejudice" as a result of the error. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (citation omitted). In *Brecht*, the Supreme Court announced the proper standard for determining whether actual prejudice occurred in the context of harmless error: the error must have had a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 638. *O'Neal v. McAninch* clarified that this standard is met when a federal court "is in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." 513 U.S. at 436 (citation and internal quotation marks omitted). "[G]rave doubt [ ] mean[s] that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id.* at 435 (internal quotation marks omitted). In other words, an "uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict." *Id.*

## A.

Before moving to the merits, we must address the parties' disagreements over the applicable standard of review.

First, the parties argue over which of them has the burden of persuasion here. *Brecht* states that a petitioner must "establish . . . actual prejudice," 507 U.S. at 637 (internal quotation

marks omitted), but this court has said that, under *Brecht*, "[t]he state bears responsibility for showing that the error had no effect on the verdict," *Rosencrantz v. Lafler*, 568 F.3d 577, 590 (6th Cir. 2009). In *O'Neal*, the Supreme Court explained that the above language from *Brecht* "is not determinative," 513 U.S. at 438, and framed the issue in a different way:

> [W]e deliberately phrase the issue in this case in terms of a judge's grave doubt, instead of in terms of "burden of proof." The case before us does not involve a judge who shifts a "burden" to help control the presentation of evidence at a trial, but rather involves a judge who applies a legal standard (harmlessness) to a record that the presentation of evidence is no longer likely to affect. In such a case, we think it conceptually clearer for the judge to ask directly, "Do I, the judge, think that the error substantially influenced the jury's decision?" than for the judge to try to put the same question in terms of proof burdens (*e.g.*, "Do I believe the party has borne its burden of showing?").

*Id.* at 436–37 (citation and ellipsis omitted). Where things are "evenly balanced," *id.* at 435, *O'Neal* instructs that the state bears the "risk of equipoise," as Reiner puts it.

The parties' second disagreement as to the standard of review concerns the interplay between the *Brecht* standard and the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").**2** AEDPA limits the ability of federal courts to grant habeas relief to a state prisoner whose claim "was adjudicated on the merits in State court." 28 U.S.C. § 2254(d); *see Fry v. Pliler*, 551 U.S. 112, 119 (2007). That is, the state court's merits adjudication must have either "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(1)–(2).

Because the Michigan Court of Appeals adjudicated Reiner's Sixth Amendment claim on the merits, the parties agree that AEDPA applies here. But they disagree as to how its limitation interacts with the standard articulated in *Brecht* (and *O'Neal*). The state argues that we should apply AEDPA deference separate and apart from the *Brecht* analysis. In its words, "a habeas petitioner must both clear the *Brecht* hurdle and show that the state court's harmlessness

---

**2**Congress passed AEDPA after the Supreme Court issued *Brecht* and *O'Neal*.

adjudication is an unreasonable application of *Chapman*." Reiner contends that *Brecht* "is the only harmlessness test the Court need apply here."

The Supreme Court and this court have made clear that "*Brecht* is always the test" for evaluating harmless error on collateral review, even where AEDPA applies. *Ruelas v. Wolfenbarger*, 580 F.3d 403, 411–12 (6th Cir. 2009). In *Fry v. Pliler*, the petitioner argued that "AEDPA replaced the *Brecht* standard of actual prejudice[ ] with the more liberal AEDPA/*Chapman* standard which requires only that the state court's harmless-beyond-a-reasonable-doubt determination be unreasonable." 551 U.S. at 119–20 (internal quotation marks and citations omitted). But the Supreme Court rejected that argument and held "that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*" regardless of whether the state court evaluated harmlessness under *Chapman*. *Id.* at 121–22. The Court added that "it certainly makes no sense to require formal application of *both* tests (AEDPA/*Chapman* and *Brecht*) when the latter obviously subsumes the former." *Id.* at 120. Following *Fry*, this court held that "[i]n this Circuit, *Brecht* is the standard for reviewing all (non-structural) errors on collateral review." *Ruelas*, 580 F.3d at 411.

The state argues that the Supreme Court's subsequent decision in *Davis v. Ayala* changed this dynamic. There, the Court repeated *Fry*'s statement that "a federal habeas court need not 'formal[ly]' apply both *Brecht* and 'AEDPA/*Chapman*,'" but emphasized that neither *Brecht* nor *Fry* "abrogate[d] the limitation on federal habeas relief that § 2254(d) plainly sets out." 135 S. Ct. at 2198 (quoting *Fry*, 551 U.S. at 119–20). The Court also engaged in a full analysis of the California Supreme Court's harmlessness decision under AEDPA/*Chapman*. *Id.* at 2198–99. Thus, the state has at least a colorable argument that AEDPA/*Chapman* should be applied separately from *Brecht*.

The problem for the state is that our precedent forecloses this approach. This court recently held that "*Ruelas*, which has not been affected by *Ayala*, . . . clearly announc[ed] that in the Sixth Circuit on habeas review we always apply *Brecht* and need not also apply AEDPA/*Chapman*." *O'Neal v. Balcarcel*, 933 F.3d 618, 625 (6th Cir. 2019). The state argues in a footnote that *Balcarcel* was wrongly decided, but, right or wrong, we are obligated to follow

that published precedent.  *See United States v. Clinton*, 338 F.3d 483, 489 (6th Cir. 2003); 6th Cir. R. 32.1(b).    And, as discussed below, even if we were to separately apply AEDPA/*Chapman*, we would find that the Michigan Court of Appeals' decision on the merits constituted an unreasonable application of *Chapman*.

B.

We evaluate whether a Confrontation Clause violation was harmless using the list of factors articulated in *Delaware v. Van Arsdall*, 475 U.S. at 684. *See Jensen v. Romanowski*, 590 F.3d 373, 379 (6th Cir. 2009).  They "include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Van Arsdall*, 475 U.S. at 684.  The state focuses its arguments on the second and fifth factors.  We address each below.

*Importance of Lewandowski's statements in the prosecution's case*.  The state admits that "Lewandowski's statements were important to the prosecution's case."  Similarly, the Michigan Court of Appeals observed (in its discussion of hearsay) that Lewandowski's statements "were strong circumstantial evidence that [Reiner] was the perpetrator of the home invasion" and "went to the very heart of the prosecutor's case." *Reiner*, 2014 WL 1515371, at *4.

Beyond that, the prosecution's prominent treatment of Lewandowski's statements at trial highlights their importance to its case.  The prosecutor's opening statement began: "Did you ever wonder what a life was worth?  Because of Joseph Reiner, a 70-year JoAnne Eisenhardt's life was worth $2.  $2."  He mentioned Lewandowski for the first time a few sentences later, and repeatedly discussed Eisenhardt's jewelry throughout.  Similarly, during his closing argument, the prosecutor discussed Lewandowski and the jewelry several times, called his testimony "critical," and stated that "I really do wish I could bring Mr. Lewandowski in to testify." A prosecutor's heavy reliance on testimony during closing argument evidences its importance in the case. *McCarley v. Kelly*, 801 F.3d 652, 666 (6th Cir. 2015); *see Madrigal v. Bagley*, 413 F.3d 548, 552 (6th Cir. 2005) ("The prosecution in fact emphasized the importance [of]

Cathcart's audiotaped statement by pointing out in its closing argument twenty things from Cathcart's statement . . . ." (internal quotation marks omitted)).  The jury's conduct here does as well.  During deliberations, the jury asked for several exhibits, including Eisenhardt's rings.  This indicates that the jurors thought them "significant."  *See Vasquez v. Jones*, 496 F.3d 564, 576 (6th Cir. 2007).

The other evidence (or lack thereof) also shows the importance of Lewandowski's statements.  "[T]he Supreme Court has recognized that in the absence of any physical evidence, '[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence.'"  *Blackston v. Rapelje*, 780 F.3d 340, 355 (6th Cir. 2015) (second alteration in original) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).  That's true here, where the prosecution's case relied almost entirely on circumstantial evidence.  And, as to Lewandowski, cross-examination—"the principal means by which the believability of a witness and the truth of his testimony are tested," *Davis*, 415 U.S. at 316—was not available.

Lewandowski's statements provided the strongest evidence in the prosecution's case of Reiner's guilt.  This court has found the *Brecht* standard was satisfied in similar situations.  *See Blackston*, 780 F.3d at 360 (offending "testimony was the linchpin of the state's case"); *Calvert v. Wilson*, 288 F.3d 823, 834 (6th Cir. 2002) (offending testimony "was the most compelling piece of evidence against Calvert").  Because Lewandowski's statements were the most important evidence presented at trial and "went to the very heart of the prosecutor's case," *Reiner*, 2014 WL 1515371, at *4, this factor favors Reiner.

*Whether Lewandowski's statements were cumulative*.  The state argues that two pieces of evidence presented at trial made Lewandowski's statements cumulative.  According to the state, Kosciolek's testimony "that he gave Reiner a ride to a bus stop, which was on the same street as another bus stop that was near the Gold Shop[,] . . . links Reiner to the place where Eisenhardt's jewelry was sold."  On this point, Kosciolek's account is circumstantial (requiring inferences from the jury), while Lewandowski's is direct evidence; he stated definitively that Reiner entered his shop and sold him the jewelry.  Kosciolek's testimony is also substantially weaker.  Kosciolek testified that he dropped off Reiner near a bus stop seven miles away from the Gold

Shop. That the Gold Shop was on the same street and near a different bus stop barely helps the prosecution.

The state also contends that the receipts from the Gold Shop made Lewandowski's testimony cumulative. The receipts were dated January 31, February 9, February 14, and February 23, respectively, all in the year 2011. Reiner's brief accurately summarizes the information contained in the receipts:

> Three of those receipts, each of which predated February 23, bore Mr. Reiner's name, along with a signature (and, in two cases, a thumb print), and indicated that Mr. Reiner had sold items to Mr. Lewandowski. The fourth receipt is dated February 23 and indicates that a seller received $2 for "gold," without specifying the nature of the item or items sold. The February 23 receipt bears a signature but does not otherwise indicate the name of the seller and does not contain a thumb print.

(Footnote and record citations omitted). Sergeant Cynthia Edwards, a "latent print examiner," testified on cross-examination that "no identifiable prints could be obtained" from the February 23 receipt for Reiner.

Unlike the other receipts, the fourth receipt (the one dated the same day as the home invasion and stabbing) did not have any readily identifiable information connecting Reiner to it. And the other receipts only proved that Reiner had been in the shop on prior occasions, before the day of the home invasion and stabbing. The prosecutor argued to the jury that the signature from the February 23 receipt matched Reiner's signature on the others, but presented no expert or layman's testimony supporting that contention.[3]

The state points out that the jury was perfectly capable of comparing the signatures without witness testimony, given that the receipts were in evidence. Michigan Rule of Evidence 901 allows the trier of fact to "authenticate a signature by comparison with specimens which have been authenticated," and the Michigan Court of Appeals found that "[t]he authentication

---

[3]This wasn't for lack of trying. When introducing the receipts during the direct examination of Detective Ernatt, the prosecutor asked him if he could read the signature on the February 9 receipt. Ernatt answered "[n]o, I cannot." The prosecutor did not ask Ernatt whether he could read the signatures on the other receipts. During the redirect of Sergeant Edwards, the prosecutor tried again, asking if "[t]hose signatures look similar to you?" Edwards responded "I can't talk about those signatures. I don't have any training in--" before the prosecutor cut her off and ended the examination.

requirement for defendant's signatures on the [January 31 and February 14 receipts] was met where defendant was listed as the customer on the records and the records contained his thumbprint." *Reiner*, 2014 WL 1515371, at *5 n.6. In this way, the state argues, "the prosecution established that Reiner was in the Gold Shop on the day of the crime and made a transaction."

This evidence provides stronger support for the state's cumulative-evidence argument than Kosiolek's testimony. But, again, it is much more attenuated than Lewandowski's direct statement that Reiner came into his shop and sold him Eisenhardt's jewelry. The February 23 receipt did not describe the item(s) sold specifically (beyond the single word "gold"), and Eisenhardt's ring was found in a tin with other "[m]iscellaneous jewelry." So in addition to engaging in the signature-comparison exercise, the jury had to infer that Eisenhardt's ring got there because Reiner sold it to Lewandowski. Indeed, without Lewandowski's testimony, there was no proof that Reiner ever possessed Eisenhardt's jewelry.

On this factor, this case is not as close as others that have still favored the habeas petitioner. "The mere fact that one other witness . . . has testified to a particular fact . . . does not render other testimony on that point 'cumulative.'" *Vasquez*, 496 F.3d at 576. For example, in *McCarley*, the offending testimony "duplicated some of the content of" three other witnesses. 801 F.3d at 667. But the court characterized the offending testimony as "akin to a keystone holding the arch of the State's case together. Remove that crucial block . . . and the State's case collapses into disjointed pieces." *Id.* And in *Madrigal*, where there was a "lack of forensic evidence linking Madrigal to the crime," the court found that the offending statement was not cumulative, as the "jury could have believed [it] reinforced the eyewitness testimony." 413 F.3d at 552 (citation omitted).

Because the two pieces of evidence identified by the state are circumstantial,**[4]** are substantially less compelling, and leave inferential gaps in ways that Lewandowski's statements do not, this factor favors Reiner.

*Presence or absence of evidence corroborating or contradicting Lewandowski's statements on material points*. Substantively, this factor as applied here largely overlaps with the second. *See McCarley*, 801 F.3d at 667. Neither party identifies any evidence contradicting Lewandowski's statements, and the only evidence corroborating them is described above. This factor also favors Reiner, as the state presented little evidence to corroborate Lewandowski's statements.

*Extent of cross-examination otherwise permitted*. It is undisputed that "Lewandowski died before trial" and Reiner "did not have a prior opportunity to cross-examine" him. *Reiner*, 2014 WL 1515371, at *3 n.2, *4. Where "the preclusion of cross-examination was complete, the fourth *Van Arsdall* factor—the extent of cross-examination otherwise permitted—weighs heavily in favor of the petitioner." *Cotto v. Herbert*, 331 F.3d 217, 254 (2d Cir. 2003). Courts have frequently found that this factor favors the petitioner even where some cross-examination of a witness did occur. *E.g.*, *Brinson v. Walker*, 547 F.3d 387, 396 (2d Cir. 2008) (this factor "strongly favor[ed]" the petitioner where counsel was permitted to ask only one question regarding bias); *Vasquez*, 496 F.3d at 577 ("[T]he trial court otherwise permitted little *effective* cross-examination of Demond Brown's preliminary examination testimony."); *Clark v. O'Leary*, 852 F.2d 999, 1007 (7th Cir. 1988) ("Petitioner's counsel was not allowed to examine regarding the potential hostility or prejudice against petitioner and thus only a routine cross on the witnesses' perception, recall, and possible prompting by the State was permitted."); *see also Davis*, 415 U.S. at 318 ("While counsel was permitted to ask Green whether he was biased, counsel was unable to make a record from which to argue why Green might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial.").

---

**[4]**Lewandowski's statements are circumstantial as to the ultimate issue of the case, but direct as to the discrete point focused on in this factor: that Reiner entered the Gold Shop on February 23 and sold Eisenhardt's jewelry to Lewandowski.

Because Reiner had no opportunity whatsoever to cross-examine Lewandowski, this factor strongly favors him.

*Overall strength of the prosecution's case.* The prosecution's case against Reiner was circumstantial. No direct physical evidence, like DNA, fingerprints, hair, or footprints tied Reiner to the crime scene. And the prosecutor admitted during his opening statement that he was "not . . . able to place with any witness Joseph Reiner inside [Eisenhardt's] house." Instead, eyewitness testimony only placed Reiner in the general area on the morning of the incident, and some of that testimony was inconsistent. Both Pauli and Kosciolek testified that Reiner was dressed entirely in dark clothing, but in her call to 9-1-1, Eisenhardt described her attacker as wearing a "blue jean jacket." On cross-examination, Pauli stated that he was "[a]bsolutely sure" Reiner was not wearing a blue jean jacket. And, as discussed above, Pauli's and Kosciolek's testimonies do little to connect Reiner to the crime scene, the Gold Shop, or Eisenhardt's jewelry.

Kosciolek's testimony certainly establishes that Reiner was acting strangely or suspiciously. He did not remove his hat or coat in the car, even though he was "sweating terribly," he avoided eye contact, and his story of coming from a trailer park was inconsistent, as he first stated he was "visiting a little girl, and then he sa[id], oh, a girl my age." The police's investigation of that story yielded no corroborating information. Kosciolek speculated that Reiner "was on some kind of drugs or something," and, as it turns out, Reiner was addicted to heroin. But the more important aspect of Kosciolek's testimony is its placement of Reiner in the general area of Eisenhardt's home at around the time of the home invasion and stabbing.

There's also Lewandowski's other statement—the voicemail "identif[ying] defendant as a person who had been in the Gold Shop the previous day"—which the Michigan Court of Appeals found was not hearsay because it was not admitted for the truth of the matter asserted. *Reiner*, 2014 WL 1515371, at *4. This evidence has little probative value for two reasons. First, it "was not offered for the truth of the matter asserted," but rather "as background evidence to explain why Ernatt acted as he did in returning to the Gold Shop on February 25, 2011, to conduct further investigation." *Id.* Statements not admitted for their truth have less evidentiary

value than those that are. Second, like the receipts, it does not establish that Reiner ever possessed Eisenhardt's jewelry.

Reiner's statement, given to law enforcement after his arrest in New York, about "big shit in Michigan" has even less value. Here is that statement in context:

Q.   Did you ask him about what he was going to do with -- about the Michigan crimes?

A.   Yes.

Q.   What did he say to you about them?

A.   He told me that he's obviously going to have to deal with that when he gets back here and figure it out.

Q.   When he indicated that all the clothing in the car was his, did he indicate to you whether there was any clothing in the car when he got it?

A.   Yes. He said, no, all the clothing was his.

Q.   There is a specific quote that I am very interested in that he, he stated to you. You asked him, what do you know about the Michigan crimes? What was his response?

A.   He said that's some big shit in Michigan.

After this exchange, the prosecutor changed the subject and asked about Reiner's address.

The state's argument that Reiner's "big shit" statement amounted to "[a]n implicit concession to the crime" is strained. The statement is so vague, it doesn't say much of anything. As Reiner argues, "[a]t most, it indicates that Mr. Reiner recognized the seriousness of the crimes with which he could be charged, not that he was guilty of committing them." Also, it's unclear which crime Reiner was referring to. Reiner was arrested in New York for an unrelated crime because the vehicle he was driving "was reported stolen out of a jurisdiction in Michigan." And moments before, Reiner admitted to the officer that he "got [the car] in Michigan" and did not have "permission and authority to be operating" it.

The state also highlights the evidence of Reiner's subsequent crime of breaking into another house and stealing a television, jewelry, and a car. This provides evidence of modus operandi: breaking into homes and stealing jewelry, and it's more persuasive than much of the other evidence the state emphasizes more heavily. *See* Fed. R. Evid. 404(b)(2).

Ultimately, this factor favors Reiner, but less so than the others. The various other pieces of circumstantial evidence build a relatively weak but plausible case of Reiner's guilt. The critical problem, however, is that none of it shows that Reiner actually possessed Eisenhardt's jewelry. In a case without direct evidence of Reiner's presence at Eisenhardt's house, connection to those fruits of the crime was crucial in placing him there. This aspect of Lewandowski's statements made the case against Reiner far more compelling than it otherwise was.

\*\*\*

At this point, it's important to reiterate what *Brecht* and *O'Neal* require, and what they do not. "The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence." *O'Neal*, 513 U.S. at 438. Here, "[t]hough it is impossible to speculate how the trial may have played out under different circumstances," application of the *Van Arsdall* factors establishes that "the prosecution's case was materially weaker" without Lewandowski's statements—the strongest evidence connecting Reiner to the home invasion and stabbing. *See Jensen*, 590 F.3d at 381. This creates, at the very least, "grave doubt" as to whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." *O'Neal*, 513 U.S. at 435.

C.

Even if we were to engage in a separate analysis under AEDPA/*Chapman*, as the state argues for, we would find that the Michigan Court of Appeals unreasonably applied *Chapman* in its merits adjudication of the harmlessness issue.

To begin, the Michigan Court of Appeals did not cite or otherwise mention *Van Arsdall* or the factors it discusses.[5] One of the two cases the court did cite, *People v. Shepherd*, includes a citation to *Van Arsdall*, but only for the general proposition that "[h]armless error analysis applies to claims concerning Confrontation Clause errors." 697 N.W.2d 144, 146 (Mich. 2005).

---

[5]The court did not mention *Chapman* either, but it did correctly identify the harmless-beyond-a-reasonable-doubt standard. *Reiner*, 2014 WL 1515371, at \*4.

Substantively, the only two factors the court discussed were the cumulative-testimony and overall-strength factors. The court did mention elsewhere that Reiner had no opportunity to cross-examine Lewandowski, but there is no indication from the opinion that the court considered this fact in its harmlessness determination. Also, the court declared elsewhere that Lewandowski's statements constituted "strong" evidence and "went to the very heart of the prosecutor's case," but did not afford that conclusion any weight in its harmless determination. *Reiner*, 2014 WL 1515371, at *4. This failure to acknowledge *Van Arsdall* or consider most of its relevant factors provides evidence that the court unreasonably applied *Chapman*.

As for the factors the court did consider, the court put undue weight on two pieces of evidence: the Gold Shop receipts and the "big shit" statement. As discussed above, the receipts by themselves fail to establish that Reiner ever possessed Eisenhardt's jewelry, and the "big shit" statement fails to establish much of anything due to its vagueness and the fact that Reiner's subsequent, independent Michigan crime loomed large over the interrogation. Given the weakness of the prosecution's case and the high burden the state was required to satisfy, we would hold that the Michigan Court of Appeals unreasonably applied *Chapman* when it determined that the admission of Lewandowski's statements was harmless beyond a reasonable doubt. *See Merolillo v. Yates*, 663 F.3d 444, 458 (9th Cir. 2011) (finding, in the alternative to the *Brecht* standard, that the petitioner would have satisfied AEDPA/*Chapman* based partially on "the inherent weaknesses of the [prosecution's] case").

V.

For the reasons discussed above, we reverse the district court's judgment and remand with instructions to grant a conditional writ of habeas corpus directing the state to either release Reiner from custody[6] or retry him within an appropriate period to be determined by the district court.

---

[6]This would, of course, apply only to Reiner's imprisonment for the convictions at issue in this case, and would not affect the state's custody of Reiner based on any other convictions stemming from separate incidents.