NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0002n.06

No. 21-2887

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**

Jan 03, 2023
DEBORAH S. HUNT, Clerk

CAVANTA MCLILLY,

      Petitioner-Appellant,

v.

NOAH NAGY, Warden,

      Respondent-Appellee.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF
MICHIGAN

OPINION

Before: KETHLEDGE, WHITE, and BUSH, Circuit Judges.

KETHLEDGE, Circuit Judge. A Michigan jury convicted Cavanta McLilly of armed robbery, assault with intent to kill, and several related firearms charges. At trial, his victim and three young accomplices identified McLilly as the perpetrator. But the trial court allowed two police officers to offer plainly inadmissible opinion testimony; and it sentenced McLilly based in part on judicially found facts that increased his minimum sentence. After losing his direct and collateral appeals in state court, McLilly brought this federal habeas action. The district court denied relief on the grounds that the trial court's mistakes were harmless. We agree, and affirm.

I.

A.

On the night of December 21, 2012, Hergid Singh was working the cash register of a Flint gas station when three teenage boys came in to buy drinks and snacks, left, and then returned a few minutes later. Ordinarily Singh sat behind bullet-proof glass, but when one of the boys

dropped his drink and shattered the bottle, Singh was forced to leave his enclosure to clean up the mess. When he did, two masked men ran into the store. The first threatened Singh with a gun, told him not to move, and demanded money. The other emptied the register and went through Singh's pockets. The first man then shot Singh in the chest, and the two left in a getaway car waiting for them outside. Multiple surveillance cameras captured the entire incident.

Singh survived the attack, and first responders brought him to the hospital. Meanwhile, the police discovered the surveillance footage and used it to create several still images. The stills showed the three boys outside, talking to an adult male who had been in the store shortly before the robbery. Flint Police Sergeant Petrich provided the pictures to a journalist, who circulated them on the local news—with immediate results. An anonymous caller told Petrich that the man pictured in the surveillance stills was Cavanta McLilly. And before the three boys even made it home, they received a phone call from their coach, who warned them that the police were circulating their photographs. The three—Demetrius Robinson, Anthony Watson, and Allah' Jawan Reeder— then decided to turn themselves in.

Sergeant Petrich confronted the boys with pictures showing them talking to McLilly. Two of them—Demetrius and Anthony—said that McLilly had tried to sell them some marijuana. But Jawan—the youngest of the three—said that McLilly approached them as they were leaving the store and offered them $100 "to get the clerk from behind the counter." Jawan explained that this is why they decided to return to the store, and why Demetrius dropped his glass bottle.

Demetrius and Anthony soon realized the police would not believe their story; and their parents convinced them to return to the station. There, they recanted their earlier statements and confirmed that McLilly had asked them to drop the bottle. Meanwhile, McLilly realized he was a person of interest in the robbery investigation; so he hired an attorney and set up a date to turn

himself in.  McLilly was thereafter charged with armed robbery, assault with intent to murder, carrying a concealed weapon, and related firearms charges.

B.

At trial, the prosecution began with testimony from the police officers who had worked the case.  That testimony quickly turned to descriptions of the security footage—which the jury had not yet seen firsthand.  Over the defense's objection, one officer testified that the footage showed someone picking up and breaking a glass bottle; and that the person may have been trying to distract the clerk because "he didn't look surprised" when he dropped the bottle.  The court eventually cut this testimony short.  But the bulk of the testimony from the prosecution's next witness, another police officer, also related to the security footage.  That officer testified that the video showed an adult man enter the gas station, look at the beverage cooler, and leave; that the same man then re-entered the store wearing a mask and accompanied by an accomplice; and that the same man was the person who shot Singh.  The prosecutor then asked if the officer could identify the perpetrator in court:

> Q: Okay.  Do you see that person…in the Courtroom today?
> A: Yes.
> Mr. McCombs: I object.  No sufficient foundation is laid that would indicate that from a mere picture on a video he can make a personal identification.

The court overruled the objection.  The prosecution then repeated its question and asked "the defendant to stand up and stand next to the photo," a request the court granted:

> The Court: All right.  Mr. McLilly, stand up there.  Right up here by the video—photo.
> Q: Is this the same person?
> A: To me it looks exactly the same person.

The prosecution continued:

> Q: And then, Officer…Are these the same clothes that this person, who you've said is the Defendant, was wearing when he came in the store the first time, and then came back to rob the store?
>
> Mr. McCombs: I object. The photographs speak for themselves. We don't need this gentleman's artistic interpretation in order to—to draw whatever conclusions the Prosecutor wishes us to draw from this.
>
> The Court: Well, I'll overrule the objection. The witness can testify. Go ahead. Thank you.
>
> […]
>
> Q: Same clothes?
>
> A: It appears the same clothes.

The prosecution elicited similar testimony from a detective, who opined, on the basis of his knowledge of the security footage, that the adult who visited the store before the robbery was "the same person that came back and robbed the store"—and then pointed at McLilly when asked to identify the robber.

The prosecution next called Demetrius, Jawan, and Anthony. Each of them testified that McLilly had offered them $100 to drop a bottle inside the store; and each of them identified McLilly in the courtroom. Demetrius and Anthony admitted to fabricating the earlier story about McLilly offering them weed. And Demetrius admitted to dropping the bottle for McLilly:

> A: He said, he's going in there and drop a bottle or something.
>
> Q: When he said go in there and drop a bottle or something, what did you guys— did you guys say okay?
>
> […]
>
> Q: And what'd you decide?
>
> A: I—I went in and did it. I did it.
>
> Q: You did it?
>
> A: Yeah.

The cashier, Hergid Singh, also testified, and he too identified McLilly in court:

> Q: …Do you see the person that shot you today in the courtroom?
>
> A: Yes.

Q: Where is that person?
A: Right here.

When defense counsel tried to cast doubt on that identification, Singh doubled down:

Q: But it is—does present a problem, doesn't it in so far as the masks are concerned, because now you know that they were wearing masks. It makes it very difficult for you to identify anybody, isn't it?
A: There is no reason not to be able to identify him. It was my death. I will be able to identify.
[…]
Q: Do you agree that you could see nothing below the bridge of his nose if those masks were in place? Do you agree with that?
A: His height, and his weight and everything is sitting in front of me. Why would I lie?

The prosecution then rested, and McLilly testified in his own defense. He admitted to being in the gas station directly before the robbery and to talking to Demetrius, Anthony, and Jawan. But according to McLilly, Demetrius had offered to sell him some marijuana; and McLilly denied asking Demetrius to break a bottle, shooting Singh, or robbing the gas station.

On cross-examination, the prosecution emphasized the similarities between McLilly and the armed robber in the security footage:

Q: That's you. I mean, let's just get real. Same coat, same everything, same hairline, same one eyebrow. That's you. Isn't it?
A: No it's not.
[…]
Q: So, how is it that you get to this gas station, you go in and seven minutes later, the same person, same clothes, same everything if for the white mask that was down around is now up around your face—goes into that gas station and robs it? How does that even make sense? It was you, was it not?
A: No, it wasn't.
[…]
Q: Why would you wear the same boots to court that you wore into that robbery?
A: Because if I did something, I would—I would—common sense, I wouldn't do nothing like that.

The jury found McLilly guilty on all counts.

C.

At sentencing, the government asked the court to increase McLilly's guidelines range on the basis that he acted with a premeditated intent to kill. Mich. Comp. Laws §777.36. At the time, Michigan's guidelines were mandatory. *See People v. Lockridge*, 498 Mich. 359 (2015). Although premeditation was not an element of any of the crimes for which McLilly had been convicted, the court found that McLilly had assaulted Singh with the premeditated intent to kill. As a result, McLilly's guidelines range changed from 135-450 to 225-570 months' imprisonment. The trial court then sentenced McLilly to concurrent prison terms of 45-60 years for assault with intent to murder, 40-60 years for armed robbery, 2-20 years for carrying a concealed weapon, and 5-30 years for being a felon in possession of a firearm; and it imposed a separate consecutive term of 2 years for the final firearms charge.

McLilly appealed his conviction, arguing primarily that the court erred by admitting the police officers' lay opinion testimony about the identity of the masked assailant in the security footage. The Michigan Court of Appeals agreed, but denied relief on the ground that the error had been harmless as defined by state law. *People v. McLilly*, No. 318627, 2015 WL 302676 at *4 (Mich. App., Jan. 22, 2015). The Michigan Supreme Court denied leave to appeal. *People v. McLilly*, 498 Mich. 866 (2015).

McLilly then filed a motion for postconviction relief in the trial court, asserting, as relevant here, claims that the admission of lay opinion testimony resulted in the denial of a fair trial and that his sentence was imposed in violation of the Sixth Amendment under the Supreme Court's decision in *Alleyne v. United States*, 570 U.S. 99 (2013) and its Michigan equivalent *People v. Lockridge*, 498 Mich. 359 (2015). The trial court denied relief on the first claim because, it said, the Court of Appeals had already addressed it. As to the second claim, it held that *Alleyne* and

*Lockridge* did not apply to McLilly's sentencing. In the alternative, the court held that it "would not have imposed a materially different sentence for defendant's Armed Robbery conviction"—apparently on the assumption that its premeditation finding had increased McLilly's robbery sentence, rather than his sentence for assault. The Michigan Court of Appeals and the Michigan Supreme Court denied leave to appeal.

McLilly then turned to federal court, where he reasserted his postconviction claims. The district court denied habeas relief. Like the Michigan Court of Appeals, it held that McLilly was not prejudiced by the inadmissible opinion testimony. The district court also held that *Alleyne* did apply to McLilly's sentencing, which took place three months after the Supreme Court's decision. The court held that any Sixth Amendment violation, however, had already been cured by the trial court's holding that it would have imposed the same sentence under advisory guidelines. The district court certified both claims for appeal, and this appeal followed.

## II.

We review de novo the district court's denial of habeas relief. *Theriot v. Vashaw*, 982 F.3d 999, 1003 (6th Cir. 2020).

## A.

McLilly first argues that police officers' extensive opinion testimony about the security footage "so infected the entire trial that the resulting conviction violate[d] due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). Although state evidentiary rulings are generally "not cognizable in federal habeas review," habeas relief is available when "the state's evidentiary ruling is so fundamentally unfair that it rises to the level of a due-process violation." *Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012).

We begin by determining the applicable standard of review. If the state court "adjudicated" McLilly's federal constitutional claim "on the merits," 28 U.S.C. § 2254(d), then we may not grant relief unless the court reached a decision contrary to Supreme Court precedent, unreasonably applied Supreme Court precedent, or based its decision on an unreasonable determination of the facts. *Johnson v. Williams*, 568 U.S. 289, 292 (2013); *see also Harrington v. Richter*, 562 U.S. 86, 101 (2011). If the state court did not adjudicate the claim on the merits, however, then our review is de novo unless the claim is procedurally defaulted. *Johnson*, 568 U.S. at 292; 28 U.S.C. § 2254(d).

Here, the Warden does not argue that McLilly has waived or defaulted his claim. And the Court of Appeals did not address whether the trial court's misapplication of the Michigan Rules of Evidence rose to the level of a due process violation. An adjudication under a state rule may be construed as an adjudication "on the merits" of a federal claim, for purposes of habeas review, if the state rule "subsumes the federal standard" and is "at least as protective as the federal standard." *Johnson*, 568 U.S. at 301. The Court of Appeals here applied a state rule which required McLilly to prove "that it is more probable than not that the [evidentiary] error was outcome determinative." *People v. Phillips*, 469 Mich. 390, 396-97 (2003) (cleaned up); *see McLilly*, 2015 WL 302676 at *4. That rule is not "at least as protective as the federal standard," which (on direct appeal) would require the prosecution to prove that any constitutional error was harmless "beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967); *see also Reiner v. Woods*, 955 F.3d 549, 555 (6th Cir. 2020). Thus, the Court of Appeals did not resolve McLilly's constitutional claim on its merits, and we review his claim de novo. *Johnson*, 568 U.S. at 301.

Not even the Warden disputes that the trial court erred by permitting multiple police officers to opine about McLilly's resemblance to the perpetrator shown in grainy and purple-hued

-8-

security footage. And we have previously held that improper opinion testimony from a police officer can render a trial fundamentally unfair, in violation of the Due Process Clause, at least where that testimony directly "suggests to the jury the guilt of the accused and the innocence of other suspects." *Cooper v. Sowders*, 837 F.2d 284, 287 (6th Cir. 1988).

Here, two officers who arrived on the scene long after the robbers had left identified McLilly as the perpetrator of the crime on the basis of a video that the jury had not yet seen. That testimony "invaded the province of the jury" by providing "an insider's opinion on who committed the crime." *Id.* The officers here did not just "suggest to the jury" that McLilly was guilty—they repeatedly said he was the robber. Those identifications almost certainly colored the jury's own viewing of the surveillance footage, which the prosecution did not show until the next day. And the admission of opinion testimony that directly influences a jury's consideration of guilt or innocence is constitutional error. *See Cooper*, 837 F.2d at 287. Hence the trial court's errors likely amounted to a violation of McLilly's right to a fair trial. *Estelle,* 502 U.S. at 72.

That does not end the matter, however, because this case comes to us on collateral review. As the Supreme Court has repeatedly explained, we may not grant habeas relief for even a constitutional error at trial unless it "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 627 (1993); *Davis v. Ayala*, 576 U.S. 257, 276-77 (2015); *Brown v. Davenport,* 142 S. Ct. 1510, 1523 (2022). To grant relief, a federal habeas court must be "in grave doubt" about whether the error was harmless, which means that "the matter is so evenly balanced that [the judge] feels himself in virtual equipoise as to the harmlessness of the error." *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995).

Here, the prosecution built a powerful case against McLilly. At trial, the victim repeatedly identified McLilly as his assailant. He explained that he recognized McLilly because "his eyes

and his face is the same thing" and said that "his height, and his weight and everything is sitting in front of me." The three boys who spoke to McLilly all testified that McLilly had offered them money to lure the store clerk from his protective enclosure; and they all identified McLilly in the courtroom. And McLilly admitted that he talked to the boys outside the gas station on the night of the robbery—which meant he could not challenge their in-court identifications.

Meanwhile, McLilly's own version of events was implausible. He tried to adopt the story Demetrius and Anthony had initially told the police—that he and the boys discussed marijuana—but said that Demetrius had offered to sell him the drugs, rather than the other way around. And he denied all involvement in the robbery. To believe McLilly, the jury would have had to accept that Demetrius reentered the store on a whim; grabbed and dropped a glass bottle entirely by accident; and led the store clerk to leave his enclosure immediately before an armed robbery by mere happenstance. And the jury would need to believe that despite testimony from all three boys that Demetrius dropped the bottle at McLilly's insistence; and in spite of the boys' prior statements to the police, in which they voluntarily implicated themselves in an armed robbery. Even if defense counsel successfully cast doubt on the elder boys' changing stories, Jawan's confession was immediate, spontaneous, and consistent—and the defense found no way to challenge it at trial.

In light of this evidence, which was untainted by the court's errors, we conclude that McLilly cannot show the prejudice required for the "extraordinary remedy" of habeas relief. *Brecht*, 507 U.S. at 634.

B.

McLilly next argues that his sentence violated the Sixth Amendment because the trial court relied on judicially found facts to increase McLilly's mandatory minimum sentence. As the Supreme Court has explained, "any fact that, by law, increases the penalty for a crime is an element

that must be submitted to a jury and found beyond a reasonable doubt." *Alleyne*, 570 U.S at 103. The Warden concedes that McLilly's sentence violated the Sixth Amendment. Hence the only issue is whether McLilly is entitled to relief for that violation.

Two remedies are available to resolve a Sixth Amendment sentencing problem. *See Morrell v. Wardens*, 12 F.4th 626, 627-28 (6th Cir. 2021). The reviewing court may order a full resentencing, or it may opt for a remand to "ask the sentencing court if it would change its mind" under advisory guidelines. *Reign v. Gidley*, 929 F.3d 777, 783 (6th Cir. 2019). For purposes of habeas review, a state court may choose either remedy without falling afoul of "clearly established federal law." *Morrell*, 12 F.4th at 633.

Here, the trial court mistakenly rejected McLilly's Sixth Amendment claim. But it held in the alternative that "the Court would not have imposed a materially different sentence for defendant's Armed Robbery conviction" under advisory guidelines. The question, then, is whether that alternative holding suffices to cure the Sixth Amendment violation in lieu of a remand. Precedent says that it does. *Reign*, 929 F.3d at 783. We need not "ask the sentencing court if it would change its mind" when it has already made clear that it would not. *Id.*

McLilly seeks to avoid this conclusion by pointing to the trial court's mistaken reference to his armed robbery sentence. True, the court held that it would not have changed McLilly's robbery sentence, even though the Sixth Amendment violation affected only his sentence for assault. But we agree with the Warden that this mistake was inconsequential. McLilly raised, and the trial court considered, only a single Sixth Amendment argument, which was an objection to the court's premeditation finding. That finding affected only McLilly's assault sentence. The trial court therefore had no reason to address the substance of McLilly's armed robbery sentence, and its reference to that sentence could only have been a mistake. The writ of habeas corpus is a guard

-11-

"against extreme malfunctions in the state criminal justice systems," *Harrington*, 562 U.S. at 101; not a tool to correct scrivener's errors. By considering whether it would have imposed a materially different sentence under advisory guidelines, the trial court granted McLilly constitutionally adequate relief for the defect in his sentence. *Reign*, 929 F.3d at 783. We need not grant that relief a second time. *Id.*

The district court's judgment is affirmed.